# EXHIBIT A

SUMMONS – 30 DAY
### IN THE CIRCUIT COURT OF THE TWENTY-SECOND JUDICIAL CIRCUIT
McHENRY COUNTY, ILLINOIS

(Name all parties)

**TRUE VALUE COMPANY, L.L.C. and**

**TV COOPERATIVE COMPANY**

Plaintiff(s)

vs.

INTERNATIONAL HARDWARE SUPPLIES, LLC d/b/a

TRUE VALUE OF BROWARD and JOSE A. ZAMBRANO

Defendant(s)

Case Number 19 LA 000387

Amount Claimed $ 382,039.07

*(handwritten: 2-3-2020 / 0800P4 / 010 / 190 E)*

# ALIAS SUMMONS

To each Defendant: Jose Zambrano

9661 West 35th Court, Hialeah, FL 33018

**YOU ARE SUMMONED** and required to file an answer in this case, or otherwise file your appearance, in the office of the Clerk of this court, McHenry County Government Center, 2200 N. Seminary Avenue, Woodstock, Illinois, 60098, within 30 days after service of this summons, not counting the day of service. **IF YOU FAIL TO DO SO, A JUDGMENT OR DECREE BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF ASKED IN THE COMPLAINT.**

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp.

**To the officer:**

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than 30 days after its date.

DATE 1/30/2020    **Electronically issued**

*Katherine M Keefe*
KATHERINE M KEEFE, Clerk of Court

By AP
Deputy Clerk

_____ 20 _____

Plaintiff's attorney or plaintiff if he is not represented by an attorney

Name Salvador Carranza - ElevateNext Law

Attorney for Plaintiff

Address 218 N. Jefferson Street, Suite 300

City, State Zip Chicago, IL 60661

Telephone 312-676-5460

Email salvador.carranza@elevatenextlaw.com

Prepared by Salvador Carranza

Attorney Registration No. 6292519

CV-SUM9: Revised 07-01-2018                     Page 1 of 2

** FILED **  Env: 7608078
McHenry County, Illinois
19LA000387
Date: 12/5/2019 10:21 AM
Katherine M. Keefe
Clerk of the Circuit Court

IN THE CIRCUIT COURT OF THE 22ND JUDICIAL CIRCUIT
MCHENRY COUNTY, ILLINOIS

| | |
|---|---|
| TRUE VALUE COMPANY, L.L.C. f/k/a<br>TRUE VALUE COMPANY and<br>TV COOPERATIVE COMPANY,<br><br>     Plaintiffs,<br><br>     vs.<br><br>INTERNATIONAL HARDWARE SUPPLIES,<br>LLC d/b/a TRUE VALUE OF BROWARD and<br>JOSE A. ZAMBRANO,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.: **19LA000387**

> **NOTICE**
> THIS CASE IS HEREBY SET FOR A SCHEDULING CONFERENCE IN COURTROOM __TBD__ ON __3/5/2020__, AT __9:00 a.m.__ FAILURE TO APPEAR MAY RESULT IN THE CASE BEING DISMISSED OR AN ORDER OF DEFAULT BEING ENTERED.

## COMPLAINT

NOW COMES the Plaintiffs, TRUE VALUE COMPANY, L.L.C. f/k/a TRUE VALUE COMPANY (the "Company") and TV COOPERATIVE COMPANY (the "Cooperative") (hereinafter referred to collectively as "True Value"), by and through their attorney, ElevateNext Law, and complains of Defendants INTERNATIONAL HARDWARE SUPPLIES, LLC d/b/a TRUE VALUE OF BROWARD (hereinafter referred to as "International Hardware") and Jose A. Zambrano (together with International Hardware, hereinafter referred to collectively as the "Defendants"), as follows:

## NATURE OF THE CASE

1.    This is a breach of contract action arising out of International Hardware's failure to pay its outstanding debt. International Hardware entered into a retail member agreement with True Value as of June 6, 2014, which was renewed on March 1, 2018 and automatically modified from time to time thereafter until International Hardware's termination of membership on or about July 9, 2019.

2.    Pursuant to the parties' written agreements, International Hardware purchased hardware and household goods, received services upon credit or consignment, and/or borrowed money from True Value, which True Value provided, and for which International Hardware was obligated to pay.

3.    International Hardware failed and/or refused to pay for the products and services ordered from True Value and/or repay the loans that True Value provided, resulting in an outstanding balance of $382,039.07. Defendant Jose A. Zambrano personally guaranteed this debt. True Value now seeks the outstanding amounts due and owing from Defendants.

## PARTIES

4.      Plaintiff True Value Company, L.L.C. is a Delaware limited liability company, formerly known as True Value Company, and qualified to do business in Illinois with offices in Harvard, McHenry County, Illinois.

5.      Plaintiff TV Cooperative Company is a Delaware corporation operating as a cooperative, with a registered office located in Wilmington, New Castle County, Delaware.

6.      Defendant International Hardware is a Florida limited liability company, with a principal office located at 9661 West 35th Court, Hialeah, Florida, 33018, and a registered office located at Attn: Duarte Rojas & Associates LLC, 7225 NW 25th Street, Suite 206, Miami, Florida 33122.

7.      Defendant Jose A. Zambrano is the President of International Hardware, and is an individual whose last known address is 9661 West 35th Court, Hialeah, Florida 33018.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over Defendants because they expressly agreed in the Retail Member Agreement (and Terms and Conditions of Sale) and Personal Guaranty that are the basis for this lawsuit that they would be subject to the jurisdiction of this Court.

9.      In addition, this judicial district is an appropriate venue for this lawsuit because a substantial part of the events giving rise to the claim occurred in this judicial district. Moreover, Defendants agreed in the Retail Member Agreement (and Terms and Conditions of Sale) and Personal Guaranty that are the basis for this lawsuit that this judicial district is an appropriate venue for this lawsuit.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

10.      True Value is, and has been for over 70 years, the wholesaler for independently owned and operated retail hardware stores, which purchase products and services from True Value either as customers pursuant to terms and conditions of sale, or as members who joined the True Value cooperative network by signing a retail member agreement with True Value, or its predecessors.

11.      The purpose of the True Value cooperative network is to aggregate the group buying power and group billing procedures of customers and the member stores ("Members") to enable them to purchase inventory at prices lower than they could negotiate individually. True Value does not provide its Members with any kind of store operation plan, nor does it require them to operate their store in a particular way. These Members, as independent retailers, are allowed to use the True Value® mark, and are free to decide how to operate their business, determine what merchandise they will stock, sell or rent, and how their stores shall be identified.

12.     Prior to doing business as True Value Company, L.L.C. and TV Cooperative Company, True Value was formerly known as True Value Company, and conducted business as such, at times pertinent to this matter.

13.     At all times relevant hereto, Defendant International Hardware owned and operated the True Value of Broward store location in Cooper City, Florida, as a Member of True Value (under Member #19540).

14.     On or about June 6, 2014, International Hardware joined the True Value cooperative network by signing a retail member agreement with True Value, which was renewed on March 1, 2018 and automatically modified from time to time thereafter, and remained a Member until July 9, 2019. True and correct copies of International Hardware's signed retail member agreements dated June 6, 2014 and March 1, 2018 are attached hereto as Group Exhibit A.

15.     According to the terms and conditions of International Hardware's signed retail member agreement with True Value dated March 1, 2018, the agreement "shall be automatically modified upon notice from the Company to the Member of any relevant change in the Certificate of Incorporation and/or By-Laws of the Company, or by resolution of the Board of Directors." (*See* Group Ex. A, 3/1/18 Agreement, at ¶ 32.)

16.     In March 2018, True Value's then-Board of Directors approved the current operating Retail Member Agreement ("Member Agreement") and By-Laws of the Cooperative ("By-Laws") in connection with a proposed private equity transaction, and the proposed transaction was approved by an affirmative vote of a majority of the current stockholders of the Company, after notice and at a special meeting held on April 20, 2018.

17.     The new Member Agreement and By-Laws were then authorized and adopted by the Cooperative's Board of Directors and became effective on April 20, 2018, and on such date, the new Member Agreement automatically modified and took the place of all prior retail member agreements signed by International Hardware. True and correct copies of the current operating Member Agreement and By-Laws, in effect at the time of International Hardware's termination of membership, are attached hereto as Exhibits B-C, respectively.

18.     The Member Agreement is governed by the Terms and Conditions of Sale, attached to the Member Agreement as Annex 1 (the "Terms"), and obligates International Hardware "to pay in full on the date due all invoices on accounts receivable statements and any other financial obligations to [True Value] or its subsidiaries." (*See* Ex. B, Annex I, at 1.) Failure to pay any amount when due is an event of default, and allows True Value to terminate the Terms and "declare immediately due and payable the obligations of [International Hardware]...." (*Id.* at 2.) In any event, International Hardware "shall remain liable for all loss and damage sustained by [True Value] because of [International Hardware's] default." (*Id.*)

19.     On or prior to its termination of membership on July 9, 2019, pursuant to the Member Agreement and Terms, International Hardware purchased hardware and household

goods, received services upon credit or consignment, and/or borrowed money from True Value.

20.    True Value fully performed its obligations pursuant to its agreement with International Hardware, and provided or caused to be provided the valuable products, services and/or loans that International Hardware ordered.

21.    International Hardware accepted these products, services and/or loans; however, it failed and/or refused to pay for them, and as of July 16, 2019, True Value is owed $382,039.07 for International Hardware's unpaid products, services and/or loans, plus any additional fees incurred by True Value to collect the amount owed by International Hardware. A true and correct copy of International Hardware's most recently published Member Statement evidencing the outstanding debt is attached hereto as Exhibit D.

**COUNT I**
**BREACH OF CONTRACT**
**(against International Hardware)**

22.    Plaintiff repeats, re-alleges and incorporates by reference its paragraphs 1-21, as if fully set forth herein.

23.    The Member Agreement and Terms constitute a valid and enforceable contract between True Value and International Hardware.

24.    True Value has performed all obligations and duties required of it pursuant to the terms of the pertinent Member Agreement and Terms between the parties.

25.    On June 25, 2019, True Value delivered written notice to International Hardware of the total amount then owed by International Hardware for any unpaid financial obligations to True Value, and demanded payment in full within ten (10) days. A true and correct copy of True Value's demand letter dated June 25, 2019 is attached hereto as Exhibit E.

26.    Notwithstanding True Value's performance of all of its obligations, International Hardware failed and/or refused to pay True Value for International Hardware's outstanding debt to True Value.

27.    As a result of its failure and refusal to pay the sum of $382,039.07 to True Value, International Hardware has breached the obligations of its Member Agreement and Terms.

28.    Additionally, the Terms provides that "[a] finance charge of one and one-half percent (1½%) per month will be applied to any unpaid balance after thirty (30) days" and "[i]n the event that collection efforts are necessary, [True Value] shall be entitled to the recovery of all costs and expenses, including attorneys' fees." (*See* Ex. B, Annex I, at 1.)

29.    As a direct and proximate result of International Hardware's breach of the Member Agreement and Terms, True Value has sustained damages in the sum of $382,039.07 plus costs, interest as it accrues and attorneys' fees, and International Hardware is obligated to pay such damages.

4

WHEREFORE, Plaintiff True Value prays that this Honorable Court enter Judgment in its favor and against Defendant International Hardware in the amount of $382,039.07 plus costs, interest as it accrues and attorneys' fees, and such further relief as this Court shall deem just and equitable.

## COUNT II
## ACCOUNT STATED
### (against International Hardware)

30.     Plaintiff repeats, re-alleges and incorporates by reference its paragraphs 1-21, as if fully set forth herein.

31.     True Value and International Hardware have conducted previous monetary transactions wherein True Value agreed to sell products, furnish services upon credit or consignment and/or lend monies to International Hardware for a sum certain and International Hardware agreed to pay that amount to True Value. These transactions were reflected in the bi-monthly Member Statements and monthly Loan Statements that True Value sent to International Hardware, specifically setting forth the amounts due and owing.

32.     The Member Statement attached hereto as Exhibit D represents these transactions between True Value and International Hardware, and includes the final transactions between them. Exhibit D is a true and correct copy of the most recently published Member Statement, and the cumulative balance of $382,039.07 stated thereon is accurate.

33.     Pursuant to the Member Agreement and Terms, International Hardware promised to pay its account receivable balance and other financial obligations in full on the date due, as shown in Exhibit D, but has failed, refused and continues to refuse to do so.

34.     International Hardware has not disputed or objected to any of the Member Statements or Loan Statements sent by True Value setting forth the amounts due and owing for products, services and/or loans, including the most recently published Member Statement contained in Exhibit D.

WHEREFORE, Plaintiff True Value prays that this Honorable Court enter Judgment in its favor and against Defendant International Hardware in the amount of $382,039.07 plus costs, interest as it accrues and attorneys' fees, and such further relief as this Court shall deem just and equitable.

## COUNT III
## BREACH OF PERSONAL GUARANTY OBLIGATION
### (against Jose A. Zambrano)

35.     Plaintiff repeats, re-alleges and incorporates by reference its paragraphs 1-21, as if fully set forth herein.

5

36.     On or about December 13, 2017, to induce True Value to continue providing products and/or services to International Hardware, Defendant Jose A. Zambrano ("Guarantor") unconditionally guaranteed the obligations of International Hardware by signing a Personal Guaranty in favor of True Value. A true and correct copy of Guarantor's signed Personal Guaranty is attached hereto as Exhibit F.

37.     True Value provided products, services and/or loans to International Hardware, as a result of which International Hardware became indebted to True Value, as set forth in Count One, above. International Hardware has not satisfied its debt to True Value.

38.     True Value has performed all of its obligations and duties to Defendants.

39.     By the terms of the Personal Guaranty, Guarantor guaranteed the payment of all amounts due and owing to True Value by International Hardware for such products, services and/or loans. (Ex. F at 1.)

40.     Furthermore, the Personal Guaranty provides that Illinois law governs and that True Value is authorized to file suit against Guarantor in Cook County or any Illinois county contiguous thereto. (Ex. F at 2.)

41.     On June 25, 2019, True Value delivered written notice to Guarantor that International Hardware's account was past due, and demanded payment in full within ten (10) days of the entire amount owed by International Hardware and guaranteed by Guarantor. A true and correct copy of True Value's letter to Guarantor dated June 25, 2019 is attached hereto as Exhibit G.

42.     As of July 16, 2019, International Hardware owed True Value a total of $382,039.07, plus costs, interest as it accrues and attorneys' fees. True Value has demanded that International Hardware pay the amount due, but International Hardware has failed and/or refused to pay.

43.     Pursuant to the terms of the Personal Guaranty, Guarantor is obligated to satisfy International Hardware's debt to True Value. Yet, despite True Value's demand, Guarantor has failed and/or refused to perform the obligations of the Personal Guaranty and to pay True Value the sum of $382,039.07, representing International Hardware's outstanding debt owed to True Value.

44.     Additionally, the Personal Guaranty provides that "Should [True Value] employ an attorney or attorneys to enforce the payment or other terms of this guaranty, or to enforce the payment of any claim or claims against any of the Debtors, [True Value] shall be entitled to reimbursement from the undersigned of the amount of attorneys' fees and other costs which [True Value] may have paid or obligated [itself] to pay." (*See* Ex. F at 2.)

45.     As a direct and proximate result of Guarantor's breach of the Personal Guaranty, True Value has sustained damages in the sum of $382,039.07 plus costs, interest as it accrues and attorneys' fees, and Guarantor is obligated to pay such damages.

6

WHEREFORE, Plaintiff True Value prays that the Court enter Judgment in its favor and against Defendant Jose A. Zambrano in the amount of $382,039.07 plus costs, interest as it accrues and attorneys' fees, and such other and further relief as this Court shall deem just and equitable.

Respectfully submitted,

TRUE VALUE COMPANY, L.L.C. f/k/a
TRUE VALUE COMPANY and TV
COOPERATIVE COMPANY, Plaintiffs

By:     */s/ Salvador Carranza*
Salvador Carranza, ARDC #6292519
One of Their Attorneys

Salvador Carranza, ARDC #6292519
Matthew R. Campobasso, ARDC #6289170
ELEVATENEXT LAW
218 N. Jefferson Street, Suite 300
Chicago, IL 60661
Telephone:  312.676.5460
Facsimile: 312.676.5499
Salvador.carranza@elevatenextlaw.com
Matthew.campobasso@elevatenextlaw.com
*Attorneys for Plaintiffs*

7

# RETAIL MEMBER AGREEMENT WITH TRUE VALUE COMPANY
## A COOPERATIVE OF INDEPENDENT RETAILERS

**THIS AGREEMENT** between

INTERNATIONAL HARDWARE SUPPLIES, LLC

d/b/a    TRUE VALUE

☒ True Value          ☐ Home & Garden Showplace          ☐ Induserve          ☐ Non-Branded
☐ Grand Rental          ☐ Party Central          ☐ Taylor Rental

OF  2545 NORTH HIATUS RD          COOPER CITY FL 33026-1361
                                   **(Full Address)**

the retail member hereinafter referred to as the "Member," and TRUE VALUE COMPANY, a Delaware Corporation, hereinafter referred to as the "Company."

The Company is an organization operated on a cooperative basis by and for independent retailers who operate hardware stores, home or garden centers, rental stores or similar operations.

## MEMBER AND COMPANY AGREE AS FOLLOWS:

1.     This agreement is subject to and incorporates herein the Company's By-Laws, Subscription to Shares agreement, and the Members' Policies and Procedures Manuals ("Manuals") all of which may be amended from time to time (hereinafter collectively referred to as "Agreement").

2.     The Company shall sell merchandise of the type typically sold in retail hardware stores, home and garden centers, rented at full service rental centers, or sold to commercial/industrial customers, provide for shipment or delivery of such merchandise to the Member's address indicated on this Agreement, permit use of the service mark associated with the program checked above ("Designated Mark") and other permitted Company owned servicemarks, trademarks, collective membership marks, tradenames or brandnames ("Marks") under the conditions of this Agreement and offer services to the Member as Company may decide to offer from time to time.

3.     The Company shall invoice Member at the Company's then current prices for the merchandise and services involved, and apply all payments by Member toward final settlement of the Member's financial obligations to the Company. The excess, if any, of the payments made, less any additional expenses due to non-conformance with established payment policies or prescribed procedures, shall be paid or credited to the Member.

4.     The Company shall pay to the Member a Patronage Dividend on the basis of the volume of and margins applicable to merchandise and services purchased by the Member from the Company during each such year that Patronage Dividends are available. The availability of Patronage Dividends shall be determined by the Company as of the end of each fiscal year of the Company and shall be payable out of the excess, if any, of gross margins from business done with or for Members, after deducting therefrom the following:

(a) Expenses directly or indirectly related to such business;

(b) Such reasonable charges and reserves for necessary corporate purposes as may from time to time be determined by the Company for depreciation and obsolescence, state and federal taxes, bad debts, casualty losses, insurance and other corporate and operating charges and expenses, all established and computed in accordance with generally accepted accounting principles; and

(c) Such reasonable charges and reserves for working capital necessary for the operation of the Company and for deficits arising from such operation, including deficits from business other than business done with or for Members.



(d) In any fiscal year, to the extent a loss exists after deducting such expenses, charges and reserves, the Company will determine on a reasonable basis a plan to allocate the loss to Members.

The Company shall reasonably allocate and pay any Patronage Dividend within a time reasonably determined by the Company following the end of each fiscal year, but in no event later than the fifteenth day of the ninth month after the close of each such fiscal year, in accordance with its By-Laws, policies and procedures as they may be amended or changed from time to time.

5.      The Company shall hold Markets and other meetings from time to time for the purpose of keeping Members better informed on trends in the industry, presenting merchandise or services available and enabling Members to exchange ideas with fellow Members.

6.      Upon execution of this Agreement, the Member shall purchase sixty (60) qualifying shares of the Company's Class A Common Stock at a purchase price of $100 per share for each store owned by Member, to a maximum of three hundred (300) shares for five (5) or more stores, as defined in the Subscription to Shares agreement.

7.      The Member shall establish, operate and maintain a retail hardware store, and/or home or garden center ("Retail Store") retailing merchandise and services to consumers if the Designated Mark is True Value or Home & Garden Showplace, or a full service rental store ("Rental Center") renting appropriate merchandise if the Designated Mark is Taylor Rental, Grand Rental or Party Central, or sell commercial/industrial merchandise if the Designated Mark is Induserve ("MRO location") and sell or rent merchandise carrying any of the Company's Marks only at the authorized retail location indicated on this Agreement.

8.      The Company has not granted any protected or exclusive territorial or geographical rights to Member and the Company may, at its sole discretion, accept any other Member at any location without limitation.

9.      The Member shall utilize the Company as its primary supplier for the types of merchandise offered by the Company under each Agreement for which a Member signs.

10.     The Member shall buy from the Company in accordance with the Company procedures and practices set forth in the Manuals, which include entering warehouse orders and claims using electronic order entry equipment functionally compatible with the Company's equipment, and entering all other orders using electronic equipment whenever possible.

11.     The Member shall honor any warranties or guarantees made to consumers that are placed on products containing Company owned Marks.

12.     The Member shall abide by all then current Company policies regarding selling or marketing on the internet.

13.     The Member shall notify the Company, in writing, immediately upon any change in business name, address, form, ownership or control.

14.     The Member shall pay in full on the date due (a) all invoices on accounts receivable statements and (b) any other financial obligations to the Company or its subsidiaries, and (c) pay a one and one-half percent (1-1/2%) per month service charge, but not to exceed the maximum amount permitted by law, on past due balance of accounts. Upon termination of this Agreement, all invoices on accounts receivable statements and any other financial obligations to the Company or its subsidiaries, including future dated invoices, from the Member to the Company and its subsidiaries shall become immediately due and payable in full.

15.     All information and material furnished or made available to the Member, including without limitation, bulletins, price lists, illustrated catalogs, merchandising and pricing options, computer software, electronic data and the Manuals are confidential property of the Company, developed and promoted for the benefit of Members, and the

Rev 01-01-2014                                   2                                   MA-TVC 1-01-12

Member agrees not to divulge or display any of the information contained in this material to anyone who is not a Member, or not affiliated with the Company without obtaining the prior written approval of the Company, and not to use such information in a way which is detrimental to the Company or its Members. The Member shall use such information and material only in connection with the Member's purchases from the Company and for the purpose of promoting the Member's business with the Member's customers. The Member acknowledges and confirms that any dissemination or other disclosure of such information and material for any other purpose, or to anyone not affiliated with the Company, shall cause immediate and irreparable harm to fellow Members and the Company. All such information and material shall be immediately returned to the Company upon termination of this Agreement.

16.      Member shall provide all financial statements, guarantees, cross collateral and cross default agreements, security agreements and any other supporting materials or documents as may from time to time be requested by Company in relation to this Agreement.

17.      Member represents that it has reviewed the By-Laws and Information Memorandum of the Company, the receipt of which is hereby acknowledged. The By-Laws providing that Membership in the Company constitutes consent to take written notices of allocation into account at their stated dollar amount as provided in section 1385(a) of the IRC, unless such written notices clearly indicate on their face that they are nonqualified, in the taxable year in which received. By entering into this Agreement, Member agrees and consents to be bound by Article IX, section 3 of the By-Laws. Such "membership consent" (within the meaning of section 1388(c)(2)(B) of the IRC) may be revoked by Member only by terminating its Membership in the Company in the manner provided in this Agreement.

18.      Member acknowledges that the Company, with the approval of the Board of Directors, has the authority to set the composition of the Patronage Dividend each year that such Patronage Dividend is available, provided that at least twenty percent (20%) of each Member's share is paid in cash or qualified check in accordance with section 1385 of the IRC.

19.      Member acknowledges that any cash payments, dividends, note maturities, interest or other payments may be applied to outstanding past due debt with Company at the Company's option and sole discretion.

20.      Member acknowledges that the Member may receive different services, charges or freight rates based on the amount of merchandise purchased by Member.

21.      Member's right to use any Designated Mark or other Mark shall be subject to the right and necessity of the Company to control the use of its Designated Mark and other Marks and to maintain the reputation for quality products and services and goodwill associated with such Marks. The Member's right to the display and use of the Designated Mark or any other Marks are permitted only on the following conditions:

(a) The Designated Mark and any other Marks permitted by the Company, are the only Company owned trademarks or servicemarks which Member is entitled to use, and the Company may, at its sole discretion, choose to sell merchandise carrying any of the Company's Marks only to Members who are permitted to use a particular Designated Mark;

(b) The Designated Mark or any other Marks cannot be used with the trademark or servicemark of any hardware store, home or garden center, building center, rental center or merchandising organization other than the Company's, and may only be used at the retail location indicated on this Agreement so long as the retail location continues to be an active retail location and as determined to be appropriate by the Board of Directors;

(c) The Member's store and premises will be maintained in a clean and orderly condition;

(d) If a Retail Store, the Member will offer sufficient breadth and depth of merchandise in the core retail departments to serve the needs of retail consumers. For a hardware store, these departments include: Builders Hardware and Supplies, Cleaning Supplies, Electrical Supplies, Lawn and Garden, Paint and related Sundries, Plumbing, Tools and Home Decor; if a Rental Center, the Member will offer sufficient breadth and depth of rental merchandise to serve the needs of rental consumers; and if a MRO location, the Member will offer sufficient breadth and depth of merchandise sufficient to serve the needs of commercial/industrial consumers.

(e) If a Retail Store or an MRO location, the Member will maintain a retail inventory of representative quantities of the Company's merchandise as offered, advertised and promoted by the Company;

(f) The Member's business operations will be conducted in such a fashion as to enhance the reputation of fellow Members and the Company; and

(g) That Member shall not be entitled to use the Designated Mark or any other Marks as part of its corporate, partnership or limited liability company name, with the exception of any Member who was a Member and used it as such prior to January, 1997.

(h) That Member shall secure and maintain in force all required licenses, permits, and certificates relating to the conduct of its business pursuant to this Agreement. That Member shall comply with all applicable laws, ordinances and regulations.

(i) In order to preserve the goodwill in the Designated Mark or Marks, that Member shall in all dealings with its customers, suppliers, Company, and public officials adhere to high standards of honesty, integrity, fair dealing and ethical conduct and Member agrees to refrain from any activity which may be injurious to Company and the goodwill associated with the Designated Mark or Marks.

22. During the term of this Agreement, Member shall not obtain any proprietary rights in the Designated Mark or any other Marks by use thereof. Member expressly acknowledges and agrees that the license granted under this Agreement to use the Designated Mark or any other Mark is non-exclusive and non-transferable, and that the Company has and retains the right to grant other licenses without any limitations as to territory, product, terms or otherwise. Within thirty days of termination of this Agreement, Member shall cease the use of all Marks, including the Designated Mark, and remove, at Member's expense, all store identification signs and decals which contain any Designated Mark or other Marks and Member shall cease any display or advertising, directly or indirectly, as a store using the Designated Mark or other Marks, including but not limited to, display in internet web sites and telephone directories. Member shall further delete the Designated Mark and any other Marks from its business name including, if applicable, Member's corporate name. Member shall transfer to the Company, at Member's expense, any internet domain names which contain the Designated Mark or any other Marks. Member agrees to confirm in writing thirty days after termination of this Agreement that Member has ceased using the Designated Mark and any other Marks.

23. If Member fails to comply with Section 22 within the time stated, Member authorizes and fully empowers the Company, or its agent, at Member's expense, to enter upon its store property and buildings, and remove all exterior and interior signs, decals and other identification items specified in that paragraph, to withhold any monies due Member until the terms of this paragraph are complied with and Member shall pay to the Company not as a penalty but as a hold-over royalty, the sum of $500 per day for each day beyond the thirty days that the Member fails to comply with that Paragraph. Company may, at its option, pursue any and all remedies available to Company for breach of this provision, including equitable or injunctive relief as well as collect the holdover royalty payment and any other damages. Member agrees to release, waive and forever discharge Company from any and all claims, demands, losses and liabilities, of any nature whatsoever, related to Company's exercise of its rights under Sections 22 and 23.

24. **Company has not represented to Member that a "minimum", "guaranteed", or "certain" income can be expected or realized. Success depends, in part, on Member devoting dedicated personal efforts to the business and exercising good business judgment in dealings with customers, suppliers, and employees. Member also acknowledges that neither Company nor any of its employees or agents has represented that Member can expect to attain any specific sales, profits, or earnings. If Company has provided estimates to Member, such estimates are for informational purposes only and do not represent any guarantee of performance by Company to Member. COMPANY MAKES NO REPRESENTATIONS OR WARRANTIES EITHER EXPRESS OR IMPLIED REGARDING THE PERFORMANCE OF MEMBER'S BUSINESS.**

25. Subject to Section 9, Member, as an independent retailer, is free to decide how to operate its business, determine what merchandise it will stock, sell or rent and how its store shall be identified utilizing the Designated Mark and additional words or phrases that identify the specific location indicated on this Agreement.

26. Member and Company understand and agree that this Agreement does not create a fiduciary relationship between Member and Company, and that Member and Company are and will be independent contractors, and that nothing in this Agreement is intended to make either Member or Company a general or special agent, joint venturer, partner, or employee of the other for any purpose. Member agrees to identify itself conspicuously in all dealings with customers, suppliers, public officials, store personnel, and others as the independent owner of Member's store and to place notices of independent ownership on forms, business cards, stationery, advertising and other materials.

27. Member and Company may not make any express or implied agreements, warranties, guarantees, or representations, or incur any debt, in the name or on behalf of the other. Company will not be obligated to Member for any damages to any person or property directly or indirectly arising out of Member's store's operation or the business conducted by Member under this Agreement.

28. The amount of any distributions with respect to Member's patronage made in written notices of allocation (as defined in section 1388 of the IRC) and which are received by Member from the Company, will be taken into account by Member at their stated dollar amounts in the manner provided in section 1385(a) of the IRC in the taxable year in which such written notices of allocation are received by Member; provided, however, that this Agreement shall not extend to written notices of allocation received by Member as part of a Patronage Dividend which clearly indicate on their face that they are nonqualified. The Member understands and agrees that the Promissory Notes and the shares of Class B Common Stock distributed by the Company in payment, or part payment, of the Patronage Dividends are "written notices of allocation" within the meaning of the statute and must be taken into account by Member. The stated dollar amount of the Promissory Notes is the principal amount thereof and the stated dollar amount of the shares of Class B Common Stock is the par value thereof. The first sentence of this paragraph is intended to constitute "consent in writing" within the meaning of section 1388(c)(2)(A) of the IRC and may be revoked as provided in section 1388(c)(1)(B) of the IRC, provided, however, that, so long as Member remains a member of the Company, revocation by Member of its "consent in writing" shall not revoke Member's "membership consent."

29. The Promissory Notes and Class A and Class B Common Stock need not be physically distributed to the Member but may be held in safekeeping for the Member (either in separate securities or as part of a bulk security) and that notices of the Member's allocation of Promissory Notes and Class B Common Stock to be deposited in safekeeping are "written notices of allocation" and shall be taken into account as provided for in this Agreement.

30. This Agreement is not assignable or transferable by the Member without the written consent of the Company, but Company shall have the right to assign this Agreement. Change in control or management of a corporate, partnership or limited liability company Member must be approved in writing by the Company.

31. This Agreement shall continue in force from year to year unless it is terminated as follows:

(a) The Company shall have the right to immediately terminate this Agreement by written notice to the Member, (i) in the event and at the time or after the Member becomes insolvent, commits any act of bankruptcy, files a voluntary petition in bankruptcy, is adjudicated a bankrupt and such Member does not thereafter reaffirm this Agreement; (ii) if Member breaches any term, condition or obligation under this Agreement or any other agreement with the Company or one of its subsidiaries, which breach is not cured within thirty (30) days (ten (10) days in case of nonpayment of accounts receivable statements or any other financial obligations to the Company), or within the applicable cure period in an agreement with the Company after the Member's receipt of written notice of such breach from the Company; or (iii) if Member fails to obtain written consent by the Company to a change in control or management of a corporation, partnership or limited liability company Member.

(b) This Agreement may be terminated unilaterally by the Member upon sixty (60) days written notice mailed to the Chief Executive Officer or Treasurer of the Company at the Company's principal office.

(c)    This Agreement may be terminated unilaterally by the Company upon sixty (60) days written notice mailed to the Member at the address shown on the books of the Corporation; provided, however, that such termination by the Company shall occur after the affirmative vote of two-thirds or more of the directors then in office that such termination is in the best interests of the Company as determined in the sole discretion of the Board of Directors

32.    This Agreement shall be automatically modified upon notice from the Company to the Member of any relevant change in the Certificate of Incorporation and/or By-Laws of the Company, or by resolution of the Board of Directors

33.    This Agreement, and any other agreement which Member signs with the Company, is the entire and complete Agreement between the Member and the Company and there are no prior agreements, representations, promises, or commitments, oral or written, which are not specifically contained in this Agreement or any other agreement which Member signs with the Company. **The most current form of the Company Member Agreement shall govern all past and present relations, actions or claims arising between the Company and the Member.**

34.    Should any provision of this Agreement be declared invalid under or in conflict with any existing or future law or regulation such provision shall be modified to conform with that law and such modification shall not affect any other provision of this Agreement which shall continue in full force and effect.

35.    The failure on the part of the Company at any time or times to enforce its rights under this Agreement, its Certificate of Incorporation, its By-Laws, its Manuals, any Company policies or procedures, or any written agreements with Member shall not constitute or be held to be a waiver of any succeeding breach thereof.

36.    The Company, but not the Member, shall have a security interest in, a lien on and a right, but not an obligation, of setoff against any Company issued stock or notes, dividends, interest payments or other funds held by or issued to Member, including those issued as Patronage Dividends, and against any cash portion of such Patronage Dividend which is in excess of twenty percent (20%) of the overall Patronage Dividend payable in any year for such indebtedness of the Member to the Company or its subsidiaries as may, for whatever cause, exist, including without limitation borrowings, accounts payable, and the Member's share of Company losses, as reasonably determined by the Company. Upon termination, Company shall have no obligation to redeem Member's investment unless and until (a) all amounts due and owing the Company on accounts receivable statements, ancillary agreements with the Company or any other financial obligations to the Company or its subsidiaries are paid in full and (b) Member has complied with the provisions of paragraph 22 of this Agreement. In the event that the Company initiates proceedings to recover amounts due it by Member or for any breach of this Agreement or to seek equitable or injunctive relief against the Member, the Company shall be entitled to the recovery of all associated costs, interest and reasonable attorney's fees.

37.    The Company and the Member agree that any disputes or disagreements between them, whether arising in contract, ion, or under any other theory of common or statutory law, shall be enforced and resolved against either Member or Company only in the state or federal courts located in Cook County or any Illinois county contiguous to Cook County, Illinois, or in the county in which the Company's headquarters are then located, and only be interpreted in accordance with the substantive laws of Illinois without giving effect to its conflict of laws principles.

38.    This Agreement may not be modified except as set forth herein or by a writing referencing this Agreement and signed by the Company.

Prospective Member's signature on this Agreement constitutes an offer only and this Agreement shall have no force or effect until duly accepted and signed by the Company at its principal office and National Headquarters.

WITNESS the Member's hand and seal this ___6___ day of ___June___, ___2014___

INTERNATIONAL HARDWARE SUPPLIES, LLC

_____
Member Entity

d/b/n ___TRUE VALUE___

check: ☐ sole proprietor ☐ partnership ☐ corporation ☒ limited liability company

Retail Location Address ___2555 NORTH HIATUS RD___

City ___COOPER CITY___ State ___FL___ Zip ___33026-1301___

By: ___LARRY PIRELLA___
Print Name of Authorized Person

Title: ___OWNER___

_____
Signature of Authorized Person

## ACCEPTANCE BY TRUE VALUE COMPANY

ACCEPTED this __25__ day of __July__, 20__14__, at Chicago, Illinois.

By TRUE VALUE COMPANY by its duly authorized agent.

_____   Barbara L. Wagner
                                    Vice President
                                    Title

RETAIL MEMBER AGREEMENT WITH TRUE VALUE COMPANY
A COOPERATIVE OF INDEPENDENT RETAILERS

**THIS AGREEMENT** between

International Hardware Supplies, LLC

d/b/a   True Value of Broward

☒ True Value          ☐ Home & Garden Showplace          ☐ Induserve          ☐ Non-Branded

☐ True Value Rental

Of   2555 N Hiatus Road                    Cooper City  Fl, 33026-1301
                              (Full Address)

the retail member hereinafter referred to as the "Member," and TRUE VALUE COMPANY, a Delaware Corporation, hereinafter referred to as the "Company."

The Company is an organization operated on a cooperative basis by and for independent retailers who operate hardware stores, home or garden centers, rental stores or similar operations.

MEMBER AND COMPANY AGREE AS FOLLOWS:

1.      This agreement is subject to and incorporates herein the Company's By-Laws, Subscription to Shares agreement, and the Members' Policies and Procedures Manuals ("Manuals") all of which may be amended from time to time (hereinafter collectively referred to as "Agreement").

2.      The Company shall sell merchandise of the type typically sold in retail hardware stores, home and garden centers, rented at full service rental centers, or sold to commercial/industrial customers, provide for shipment or delivery of such merchandise to the Member's address indicated on this Agreement, permit use of the service mark associated with the program checked above ("Designated Mark") and other permitted Company owned servicemarks, trademarks, collective membership marks, tradenames or brandnames ("Marks") under the conditions of this Agreement and offer services to the Member as Company may decide to offer from time to time.

3.      The Company shall invoice Member at the Company's then current prices for the merchandise and services involved, and apply all payments by Member toward final settlement of the Member's financial obligations to the Company. The excess, if any, of the payments made, less any additional expenses due to non-conformance with established payment policies or prescribed procedures, shall be paid or credited to the Member.

4.      The Company shall pay to the Member a Patronage Dividend on the basis of the volume of and margins applicable to merchandise and services purchased by the Member from the Company during each such year that Patronage Dividends are available. The availability of Patronage Dividends shall be determined by the Company as of the end of each fiscal year of the Company and shall be payable out of the excess, if any, of gross margins from business done with or for Members, after deducting therefrom the following:

        (a) Expenses directly or indirectly related to such business;

        (b) Such reasonable charges and reserves for necessary corporate purposes as may from time to time be determined by the Company for depreciation and obsolescence, state and federal taxes, bad debts, casualty losses, insurance and other corporate and operating charges and expenses, all established and computed in accordance with generally accepted accounting principles; and

        (c) Such reasonable charges and reserves for working capital necessary for the operation of the Company and for deficits arising from such operation, including deficits from business other than business done with or for Members.

(d) In any fiscal year, to the extent a loss exists after deducting such expenses, charges and reserves, the Company will determine on a reasonable basis a plan to allocate the loss to Members.

The Company shall reasonably allocate and pay any Patronage Dividend within a time reasonably determined by the Company following the end of each fiscal year, but in no event later than the fifteenth day of the ninth month after the close of each such fiscal year, in accordance with its By-Laws, policies and procedures as they may be amended or changed from time to time.

5.      The Company shall hold Reunions and other meetings from time to time for the purpose of keeping Members better informed on trends in the industry, presenting merchandise or services available and enabling Members to exchange ideas with fellow Members.

6.      Upon execution of this Agreement, the Member shall purchase sixty (60) qualifying shares of the Company's Class A Common Stock at a purchase price of $100 per share for each store owned by Member, to a maximum of three hundred (300) shares for five (5) or more stores, as defined in the Subscription to Shares agreement.

7.      The Member shall establish, operate and maintain a retail hardware store, and/or home or garden center ("Retail Store") retailing merchandise and services to consumers if the Designated Mark is True Value or Home & Garden Showplace, or a full service rental store ("Rental Center") renting appropriate merchandise if the Designated Mark is True Value Rental,, or sell commercial/industrial merchandise if the Designated Mark is Induserve ("MRO location") and  sell or rent merchandise carrying any of the Company's Marks only at the authorized retail location indicated on this Agreement.

8.      The Company has not granted any protected or exclusive territorial or geographical rights to Member and the Company may, at its sole discretion, accept any other Member at any location without limitation.

9.      The Member shall utilize the Company as its primary supplier for the types of merchandise offered by the Company under each Agreement for which a Member signs.

10.      The Member shall buy from the Company in accordance with the Company procedures and practices set forth in the Manuals, which include entering warehouse orders and claims using electronic order entry equipment functionally compatible with the Company's equipment, and entering all other orders using electronic equipment whenever possible.

11.      The Member shall honor any warranties or guarantees made to consumers that are placed on products containing Company owned Marks.

12.      The Member shall abide by all then current Company policies regarding selling or marketing on the internet.

13.      The Member shall notify the Company, in writing, immediately upon any change in business name, address, form, ownership or control.

14.      The Member shall pay in full on the date due (a) all invoices on accounts receivable statements and (b) any other financial obligations to the Company or its subsidiaries, and (c) pay a one and one-half percent (1-1/2%) per month service charge, but not to exceed the maximum amount permitted by law, on past due balance of accounts. Upon termination of this Agreement, all invoices on accounts receivable statements and any other financial obligations to the Company or its subsidiaries, including future dated invoices, from the Member to the Company and its subsidiaries shall become immediately due and payable in full.

15.      All information and material furnished or made available to the Member, including without limitation, bulletins, price lists, illustrated catalogs, merchandising and pricing options, computer software, electronic data and

the Manuals are confidential property of the Company, developed and promoted for the benefit of Members, and the Member agrees not to divulge or display any of the information contained in this material to anyone who is not a Member, or not affiliated with the Company without obtaining the prior written approval of the Company, and not to use such information in a way which is detrimental to the Company or its Members. The Member shall use such information and material only in connection with the Member's purchases from the Company and for the purpose of promoting the Member's business with the Member's customers. The Member acknowledges and confirms that any dissemination or other disclosure of such information and material for any other purpose, or to anyone not affiliated with the Company, shall cause immediate and irreparable harm to fellow Members and the Company. All such information and material shall be immediately returned to the Company upon termination of this Agreement.

16.     Member shall provide all financial statements, guarantees, cross collateral and cross default agreements, security agreements and any other supporting materials or documents as may from time to time be requested by Company in relation to this Agreement.

17.     Member represents that it has reviewed the By-Laws and Information Memorandum of the Company, the receipt of which is hereby acknowledged, the By-Laws providing that Membership in the Company constitutes consent to take written notices of allocation into account at their stated dollar amount as provided in section 1385(a) of the IRC, unless such written notices clearly indicate on their face that they are nonqualified, in the taxable year in which received. By entering into this Agreement, Member agrees and consents to be bound by Article IX, section 3 of the By-Laws. Such "membership consent" (within the meaning of section 1388(c)(2)(B) of the IRC) may be revoked by Member only by terminating its Membership in the Company in the manner provided in this Agreement.

18.     Member acknowledges that the Company, with the approval of the Board of Directors, has the authority to set the composition of the Patronage Dividend each year that such Patronage Dividend is available, provided that at least twenty percent (20%) of each Member's share is paid in cash or qualified check in accordance with section 1385 of the IRC.

19.     Member acknowledges that any cash payments, dividends, note maturities, interest or other payments may be applied to outstanding past due debt with Company at the Company's option and sole discretion.

20.     Member acknowledges that the Member may receive different services, charges or freight rates based on the amount of merchandise purchased by Member.

21.     Member's right to use any Designated Mark or other Mark shall be subject to the right and necessity of the Company to control the use of its Designated Mark and other Marks and to maintain the reputation for quality products and services and goodwill associated with such Marks. The Member's right to the display and use of the Designated Mark or any other Marks are permitted only on the following conditions:

        (a) The Designated Mark and any other Marks permitted by the Company, are the only Company owned trademarks or servicemarks which Member is entitled to use, and the Company may, at its sole discretion, choose to sell merchandise carrying any of the Company's Marks only to Members who are permitted to use a particular Designated Mark;

        (b) The Designated Mark or any other Marks cannot be used with the trademark or servicemark of any hardware store, home or garden center, building center, rental center or merchandising organization other than the Company's, and may only be used at the retail location indicated on this Agreement so long as the retail location continues to be an active retail location and as determined to be appropriate by the Board of Directors;

        (c) The Member's store and premises will be maintained in a clean and orderly condition;

        (d) If a Retail Store, the Member will offer sufficient breadth and depth of merchandise in the core retail departments to serve the needs of retail consumers. For a hardware store, these departments include: Builders Hardware and Supplies, Cleaning Supplies, Electrical Supplies, Lawn and Garden, Paint and related Sundries, Plumbing, Tools and Home Decor; if a Rental Center, the Member will offer sufficient breadth and depth of rental merchandise to serve the needs of rental consumers; and if a MRO location, the Member will offer sufficient breadth and depth of merchandise sufficient to serve the needs of commercial/industrial consumers.

(e) If a Retail Store or an MRO location, the Member will maintain a retail inventory of representative quantities of the Company's merchandise as offered, advertised and promoted by the Company;

(f) The Member's business operations will be conducted in such a fashion as to enhance the reputation of fellow Members and the Company; and

(g) That Member shall not be entitled to use the Designated Mark or any other Marks as part of its corporate, partnership or limited liability company name, with the exception of any Member who was a Member and used it as such prior to January, 1997.

(h) That Member shall secure and maintain in force all required licenses, permits, and certificates relating to the conduct of its business pursuant to this Agreement. That Member shall comply with all applicable laws, ordinances and regulations.

(i) In order to preserve the goodwill in the Designated Mark or Marks, that Member shall in all dealings with its customers, suppliers, Company, and public officials adhere to high standards of honesty, integrity, fair dealing and ethical conduct and Member agrees to refrain from any activity which may be injurious to Company and the goodwill associated with the Designated Mark or Marks.

22.     During the term of this Agreement, Member shall not obtain any proprietary rights in the Designated Mark or any other Marks by use thereof. Member expressly acknowledges and agrees that the license granted under this Agreement to use the Designated Mark or any other Mark is non-exclusive and non-transferable, and that the Company has and retains the right to grant other licenses without any limitations as to territory, product, terms or otherwise. Within thirty days of termination of this Agreement, Member shall cease the use of all Marks, including the Designated Mark, and remove, at Member's expense, all store identification signs and decals which contain any Designated Mark or other Marks and Member shall cease any display or advertising, directly or indirectly, as a store using the Designated Mark or other Marks, including but not limited to, display in internet web sites and telephone directories. Member shall further delete the Designated Mark and any other Marks from its business name including, if applicable, Member's corporate name. Member shall transfer to the Company, at Member's expense, any internet domain names which contain the Designated Mark or any other Marks. Member agrees to confirm in writing thirty days after termination of this Agreement that Member has ceased using the Designated Mark and any other Marks.

23.     If Member fails to comply with Section 22 within the time stated, Member authorizes and fully empowers the Company, or its agent, at Member's expense, to enter upon its store property and buildings, and remove all exterior and interior signs, decals and other identification items specified in that paragraph, to withhold any monies due Member until the terms of this paragraph are complied with and Member shall pay to the Company not as a penalty but as a hold-over royalty, the sum of $500 per day for each day beyond the thirty days that the Member fails to comply with that Paragraph. Company may, at its option, pursue any and all remedies available to Company for breach of this provision, including equitable or injunctive relief as well as collect the holdover royalty payment and any other damages. Member agrees to release, waive and forever discharge Company from any and all claims, demands, losses and liabilities, of any nature whatsoever, related to Company's exercise of its rights under Sections 22 and 23.

24.     **Company has not represented to Member that a "minimum", "guaranteed", or "certain" income can be expected or realized. Success depends, in part, on Member devoting dedicated personal efforts to the business and exercising good business judgment in dealings with customers, suppliers, and employees. Member also acknowledges that neither Company nor any of its employees or agents has represented that Member can expect to attain any specific sales, profits, or earnings. If Company has provided estimates to Member, such estimates are for informational purposes only and do not represent any guarantee of performance by Company to Member. COMPANY MAKES NO**

**REPRESENTATIONS OR WARRANTIES EITHER EXPRESS OR IMPLIED REGARDING THE PERFORMANCE OF MEMBER'S BUSINESS.**

25.  Subject to Section 9, Member, as an independent retailer, is free to decide how to operate its business, determine what merchandise it will stock, sell or rent and how its store shall be identified utilizing the Designated Mark and additional words or phrases that identify the specific location indicated on this Agreement.

26.  Member and Company understand and agree that this Agreement does not create a fiduciary relationship between Member and Company, and that Member and Company are and will be independent contractors, and that nothing in this Agreement is intended to make either Member or Company a general or special agent, joint venturer, partner, or employee of the other for any purpose. Member agrees to identify itself conspicuously in all dealings with customers, suppliers, public officials, store personnel, and others as the independent owner of Member's store and to place notices of independent ownership on forms, business cards, stationery, advertising and other materials.

27.  Member and Company may not make any express or implied agreements, warranties, guarantees, or representations, or incur any debt, in the name or on behalf of the other. Company will not be obligated to Member for any damages to any person or property directly or indirectly arising out of Member's store's operation or the business conducted by Member under this Agreement.

28.  The amount of any distributions with respect to Member's patronage made in written notices of allocation (as defined in section 1388 of the IRC) and which are received by Member from the Company, will be taken into account by Member at their stated dollar amounts in the manner provided in section 1385(a) of the IRC in the taxable year in which such written notices of allocation are received by Member; provided, however, that this Agreement shall not extend to written notices of allocation received by Member as part of a Patronage Dividend which clearly indicate on their face that they are nonqualified. The Member understands and agrees that the Promissory Notes and the shares of Class B Common Stock distributed by the Company in payment, or part payment, of the Patronage Dividends are "written notices of allocation" within the meaning of the statute and must be taken into account by Member. The stated dollar amount of the Promissory Notes is the principal amount thereof and the stated dollar amount of the shares of Class B Common Stock is the par value thereof. The first sentence of this paragraph is intended to constitute "consent in writing" within the meaning of section 1388(c)(2)(A) of the IRC and may be revoked as provided in section 1388(c)(3)(B) of the IRC, provided, however, that, so long as Member remains a member of the Company, revocation by Member of its "consent in writing" shall not revoke Member's "membership consent."

29.  The Promissory Notes and Class A and Class B Common Stock need not be physically distributed to the Member but may be held in safekeeping for the Member (either in separate securities or as part of a bulk security) and that notices of the Member's allocation of Promissory Notes and Class B Common Stock to be deposited in safekeeping are "written notices of allocation" and shall be taken into account as provided for in this Agreement.

30.  This Agreement is not assignable or transferable by the Member without the written consent of the Company, but Company shall have the right to assign this Agreement. Change in control or management of a corporate, partnership or limited liability company Member must be approved in writing by the Company.

31.  This Agreement shall continue in force from year to year unless it is terminated as follows:

(a)  The Company shall have the right to immediately terminate this Agreement by written notice to the Member, (i) in the event and at the time or after the Member becomes insolvent, commits any act of bankruptcy, files a voluntary petition in bankruptcy, is adjudicated a bankrupt and such Member does not thereafter reaffirm this Agreement; (ii) if Member breaches any term, condition or obligation under this Agreement or any other agreement with the Company or one of its subsidiaries, which breach is not cured within thirty (30) days (ten (10) days in case of nonpayment of accounts receivable statements or any other financial obligations to the Company), or within the applicable cure period in an agreement with the Company after the Member's receipt of written notice of such breach from the Company; or (iii) if Member fails to obtain written consent by the Company to a change in control or management of a corporation, partnership or limited liability company Member.

(b)     This Agreement may be terminated unilaterally by the Member upon sixty (60) days written notice mailed to the Chief Executive Officer or Treasurer of the Company at the Company's principal office.

(c)     This Agreement may be terminated unilaterally by the Company upon sixty (60) days written notice mailed to the Member at the address shown on the books of the Corporation; provided, however, that such termination by the Company shall occur after the affirmative vote of two-thirds or more of the directors then in office that such termination is in the best interests of the Company as determined in the sole discretion of the Board of Directors.

32.     This Agreement shall be automatically modified upon notice from the Company to the Member of any relevant change in the Certificate of Incorporation and/or By-Laws of the Company, or by resolution of the Board of Directors.

33.     This Agreement, including any addenda and any other agreement which Member signs with the Company, is the entire and complete Agreement between the Member and the Company and there are no prior agreements, representations, promises, or commitments, oral or written, which are not specifically contained in this Agreement or any other agreement which Member signs with the Company. **The most current form of the Company Member Agreement shall govern all past and present relations, actions or claims arising between the Company and the Member.**

34.     Should any provision of this Agreement be declared invalid under or in conflict with any existing or future law or regulation such provision shall be modified to conform with that law and such modification shall not affect any other provision of this Agreement which shall continue in full force and effect.

35.     The failure on the part of the Company at any time or times to enforce its rights under this Agreement, its Certificate of Incorporation, its By-Laws, its Manuals, any Company policies or procedures, or any written agreements with Member shall not constitute or be held to be a waiver of any succeeding breach thereof.

36.     The Company, but not the Member, shall have a security interest in, a lien on and a right, but not an obligation, of setoff against any Company issued stock or notes, dividends, interest payments or other funds held by or issued to Member, including those issued as Patronage Dividends, and against any cash portion of such Patronage Dividend which is in excess of twenty percent (20%) of the overall Patronage Dividend payable in any year for such indebtedness of the Member to the Company or its subsidiaries as may, for whatever cause, exist, including without limitation borrowings, accounts payable, and the Member's share of Company losses, as reasonably determined by the Company. Upon termination, Company shall have no obligation to redeem Member's investment unless and until (a) all amounts due and owing the Company on accounts receivable statements, ancillary agreements with the Company or any other financial obligations to the Company or its subsidiaries are paid in full and (b) Member has complied with the provisions of paragraph 22 of this Agreement. In the event that the Company initiates proceedings to recover amounts due it by Member or for any breach of this Agreement or to seek equitable or injunctive relief against the Member, the Company shall be entitled to the recovery of all associated costs, interest and reasonable attorney's fees.

37.     The Company and the Member agree that any disputes or disagreements between them, whether arising in contract, tort, or under any other theory of common or statutory law, **shall be enforced and resolved against either Member or Company only in the state or federal courts located in Cook County or any Illinois county contiguous to Cook County, Illinois, or in the county in which the Company's headquarters are then located, and only be interpreted in accordance with the substantive laws of Illinois without giving effect to its conflict of laws principles.**

38.     This Agreement may not be modified except as set forth herein or by a writing referencing this Agreement and signed by the Company.

Rev 1/1/16          6          MA-TVC 1-01-12

*Execution Version*

## RETAIL MEMBER AGREEMENT WITH TV COOPERATIVE COMPANY
### A COOPERATIVE OF INDEPENDENT RETAILERS

**THIS AGREEMENT** between

d/b/a   _____

Of:   _____

                            (Full Address)

the retail member hereinafter referred to as the "Member" and TV Cooperative Company, a Delaware corporation, hereinafter referred to as the "Cooperative" and, solely with respect to paragraphs 2, 4, 10, 12, 13, 14, 15, 21, 22, 23, 25, 26, 28, 29, 30, 31 and the Additional Member Terms and Conditions in Sections 31 through 46 below (the "Specified Provisions"), True Value Company, L.L.C., a Delaware limited liability company, hereinafter referred to as the "Company". The Member, collectively with the other retail members of the Cooperative, shall be referred to herein as the "Members". Certain capitalized terms used herein have the meaning assigned thereto in Section 30 below.

The Cooperative is an organization operated on a cooperative basis by and for independent retailers who operate hardware stores, home or garden centers, rental stores or similar operations.

**MEMBER, THE COOPERATIVE AND, SOLELY WITH RESPECT TO THE SPECIFIED PROVISIONS, THE COMPANY AGREE AS FOLLOWS:**

1.    This agreement is subject to and incorporates herein the Cooperative's Amended and Restated Certificate of Incorporation, Amended and Restated By-Laws and the Subscription to Shares Agreement and Assignment and Direction executed by Member ("Subscription to Shares Agreement"), all of which may be amended from time to time (hereinafter collectively referred to as this "Agreement").

2.    This Agreement supersedes and amends and restates in its entirety the Retail Member Agreement between Member and the Company (the "Pre-Acquisition Retail Member Agreement") and all references to the "Retail Member Agreement" in the Other Member Agreements (as defined below) shall be deemed references to this Agreement. The amendment and restatement of the Pre-Acquisition Retail Member Agreement by this Agreement shall not affect any of the Member's, the Cooperative's or the Company's rights or obligations under the Other Member Agreements.

3.    Concurrently with the Acquisition (as defined below), the Cooperative and the Company have entered into the Purchasing and Services Agreement (the "Purchasing Agreement"), pursuant to which the Cooperative shall arrange (a) for the sale by the Company to Member of merchandise of the type typically sold in retail hardware stores, home and garden centers, rented at full service rental centers, or sold to commercial/industrial customers ("Merchandise"), (b) for the provision of services by the Company to Member in support of the sale of Merchandise ("Services"), which shall include providing for shipment or delivery of Merchandise to the Member's location, and (c) for use by Member of the Company's servicemarks, trademarks, collective membership marks, trade names and brand names (collectively, "Marks").

4.    The Member acknowledges and agrees that all purchases by the Member from the Company will be governed by the Terms and Conditions of Sale. The Member further acknowledges and agrees that the Member may receive different Services, charges or freight rates based on the amount of Merchandise purchased by the Member from the Company. The Company and Member agree that, as of the date that this Agreement is authorized and adopted by the Cooperative's Board of Directors, the Terms and Conditions of Sale attached to this Agreement as Annex I shall apply to Member's purchase of



Merchandise and Services from the Company and use of the Company's Marks until such Terms and Conditions are changed in accordance with the terms thereof. The Company may amend the Additional Member Terms and Conditions in Sections 31 through 46 below at any time upon general notice on the Company's website that such Additional Member Terms and Conditions have been amended and Customer's continued purchases from the Company constitute acceptance of such Additional Member Terms and Conditions as amended. No amendment of the Specified Provisions (or the definition thereof) that would adversely affect the Company shall be effective with respect to the Company unless such amendment is approved in writing by the board of managers of TV Holdco, L.L.C. Member acknowledges and agrees that, for purposes of determining the amount of any rebate earned and payable to the Member under the Terms and Conditions of Sale or any other of the Company's rebate programs, that any amount paid to the Cooperative pursuant to the Purchasing Agreement shall be allocated by the Cooperative among the Members on the same basis as the Cooperative determines payment of Patronage Dividends, and such allocation will reduce by a corresponding amount, dollar for dollar, any such rebate earned and payable to the Member.

5.     The Cooperative shall pay to the Member a Patronage Dividend on the basis of the volume of Merchandise and Services purchased by the Member from the Company pursuant to the Purchasing Agreement during each such year that Patronage Dividends are available. The availability of Patronage Dividends shall be determined by the Cooperative as of the end of each fiscal year of the Cooperative and shall be payable out of the excess, if any, of gross margins from business done with or for Members, after deducting therefrom the following:

    (a)     Expenses directly or indirectly related to such business;

    (b)     Such reasonable charges and reserves for necessary corporate purposes as may from time to time be determined by the Cooperative for depreciation and obsolescence, state and federal taxes, bad debts, casualty losses, insurance and other corporate and operating charges and expenses, all established and computed in accordance with generally accepted accounting principles;

    (c)     Such reasonable charges and reserves necessary for the operation of the Cooperative and for deficits arising from such operation, including deficits from business other than business done with or for Members; and

    (d)     Any amount of loss suffered by the Cooperative in any fiscal year, to the extent a loss exists after deducting such expenses, charges and reserves, allocated by the Cooperative on a reasonable basis among the Members.

The Cooperative shall reasonably allocate and pay any Patronage Dividend within a time reasonably determined by the Cooperative following the end of each fiscal year, but in no event later than the fifteenth day of the ninth month after the close of each such fiscal year, in accordance with its Amended and Restated By-Laws and any policies and procedures as they may be amended or changed from time to time.

6.     Member represents that it has reviewed the Amended and Restated By-Laws, which provide that membership in the Cooperative constitutes consent to take written notices of allocation into account at their stated dollar amount as provided in section 1385(a) of the IRC, unless such written notices clearly indicate on their face that they are nonqualified, in the taxable year in which received. By entering into this Agreement, the Member agrees and consents to be bound by Article IX, section 3 of the Amended and Restated By-Laws. Such "membership consent" (within the meaning of section 1388(c)(2)(B) of the IRC) may be revoked by the Member only by terminating its membership in the Cooperative in the manner provided in this Agreement.

7.     Member acknowledges that the Cooperative, with the approval of the Board of Directors of the Cooperative, has the authority to set the composition of the Patronage Dividend each year that such

2

Patronage Dividend is available, provided that at least twenty percent (20%) of each Member's share is paid in cash or by qualified check in accordance with section 1385 of the IRC.

8.    The amount of any distributions with respect to the Member's patronage made in written notices of allocation (as defined in section 1388 of the IRC) and which are received by the Member from the Cooperative, will be taken into account by the Member at their stated dollar amounts in the manner provided in section 1385(a) of the IRC in the taxable year in which such written notices of allocation are received by the Member; provided, however, that this Agreement shall not extend to written notices of allocation received by the Member as part of a Patronage Dividend which clearly indicate on their face that they are nonqualified. The Member understands and agrees that the Promissory Notes and the shares of Class B Common Stock distributed by the Cooperative in payment, or part payment, of the Patronage Dividends are "written notices of allocation" within the meaning of the statute and must be taken into account by the Member. The stated dollar amount of the Promissory Notes is the principal amount thereof and the stated dollar amount of the shares of Class B Common Stock is the par value thereof. The first sentence of this paragraph is intended to constitute "consent in writing" within the meaning of section 1388(c)(2)(A) of the IRC and may be revoked as provided in section 1388(c)(3)(B) of the IRC, provided, however, that, so long as the Member remains a member of the Cooperative, revocation by the Member of its "consent in writing" shall not revoke the Member's "membership consent."

9.    The Promissory Notes and Class A and Class B Common Stock need not be physically distributed to the Member but may be held in safekeeping for the Member (either in separate securities or as part of a bulk security) and that notices of the Member's allocation of Promissory Notes and Class B Common Stock to be deposited in safekeeping are "written notices of allocation" and shall be taken into account as provided for in this Agreement.

10.    The Member hereby grants to the Cooperative and the Company a security interest in, a lien on and a right, but not an obligation, of setoff against any Cooperative issued stock or notes, dividends, interest payments or other funds held by or issued to the Member, including those issued as Patronage Dividends, and against any cash portion of such Patronage Dividend which is in excess of twenty percent (20%) of the overall Patronage Dividend payable in any year for such indebtedness of the Member to the Cooperative or the Company as may, for whatever cause, exist, including without limitation borrowings, accounts payable, and the Member's share of the Cooperative losses, as reasonably determined by the Cooperative or the Company, as applicable. Upon termination, the Cooperative shall have no obligation to redeem the Member's investment unless and until all amounts due and owing the Cooperative or the Company on accounts receivable statements, ancillary agreements with the Cooperative or the Company or any other financial obligations to the Cooperative or the Company are paid in full. In the event that the Cooperative or the Company initiates proceedings to recover amounts due to it by the Member or for any breach of this Agreement or other agreement to seek equitable or injunctive relief against the Member, the Cooperative or the Company, as applicable, shall be entitled to the recovery of all associated costs, interest and reasonable attorney's fees.

11.    The Member shall maintain its ownership of the number of qualifying shares of the Cooperative's Class A Common Stock as set forth in Article XII of the Amended and Restated By-Laws.

12.    The Member acknowledges and agrees that, at the Company's or the Cooperative's option and sole discretion, any cash payments, rebates, note maturities, interest or other payments owed by the Cooperative to the Member may be applied to amounts owed by the Member to the Company or the Cooperative under this Agreement and any other agreement between the Member and the Cooperative or the Company, as applicable. The Cooperative shall, at the Company's request, enforce its lien or right of setoff with respect to all indebtedness (including indebtedness evidenced by promissory notes) owed by the Member to the Company under any agreement between the Member and the Company, other than accounts receivable owed to the Company by a Member that are less than 30 days past due, and promptly remit the proceeds of such lien enforcement or setoff to the Company or its designee (including TV

3

Holdco, L.L.C.) to the extent such set off reduced amounts otherwise payable by the Cooperative to the Member.

13. Neither the Cooperative nor the Company has granted any protected or exclusive territorial or geographical rights to the Member and the Company may, in its sole discretion, sell Merchandise or provide Services to any Member or other customer at any location without limitation.

14. The Member shall notify the Cooperative, in writing, immediately upon any change in business name, address, form, ownership or control.

15. All information and material furnished or made available to the Member by or on behalf of the Cooperative pursuant to a Member's membership with the Cooperative (including any and all information regarding the business, operations, assets and properties of the Company) are confidential property of the Cooperative (or the Company, as the case may be), developed and promoted for the benefit of Members, and the Member agrees not to divulge or display any of the information contained in this material to anyone who is not a Member or not affiliated with the Cooperative without obtaining the prior written approval of the Cooperative, and not to use such information in a way which is detrimental to the Company, the Cooperative or its Members. The Member shall use such information and material only in connection with the Member's membership with the Cooperative. The Member acknowledges and confirms that any dissemination or other disclosure of such information and material for any other purpose, or to anyone not affiliated with the Cooperative, shall cause immediate and irreparable harm to fellow Members, the Cooperative and the Company. All such information and material shall be immediately returned to the Cooperative upon termination of this Agreement.

16. The Member shall provide all financial statements, guarantees, cross collateral and cross default agreements, security agreements and any other supporting materials or documents as may from time to time be requested by Cooperative in relation to this Agreement.

17. **Cooperative has not represented to Member that a "minimum", "guaranteed", or "certain" income can be expected or realized. Success depends, in part, on Member devoting dedicated personal efforts to the business and exercising good business judgment in dealings with customers, suppliers, and employees. Member also acknowledges that neither Cooperative nor any of its employees or agents has represented that Member can expect to attain any specific sales, profits, or earnings. If Cooperative has provided estimates to Member, such estimates are for informational purposes only and do not represent any guarantee of performance by Cooperative to Member. COOPERATIVE MAKES NO REPRESENTATIONS OR WARRANTIES EITHER EXPRESS OR IMPLIED REGARDING THE PERFORMANCE OF MEMBER'S BUSINESS.**

18. Member, as an independent retailer, is free to decide how to operate its business, determine what merchandise it will stock, sell or rent and how its store shall be identified, subject to the Company's Brand Standards as defined or referenced in the Terms and Conditions of Sale. If Member elects to use a Designated Mark, Member shall pay a monthly brand fee or program fee as set forth in the Brand Standards.

19. The Member and the Cooperative understand and agree that this Agreement does not create a fiduciary relationship between the Member and the Cooperative, and that the Member and the Cooperative are and will be independent contractors, and that nothing in this Agreement is intended to make either the Member or the Cooperative a general or special agent, joint venturer, partner, or employee of the other for any purpose. The Member agrees to identify itself conspicuously in all dealings with customers, suppliers,

4

public officials, store personnel, and others as the independent owner of the Member's store and to place notices of independent ownership on forms, business cards, stationery, advertising and other materials.

20.    The Member and the Cooperative may not make any express or implied agreements, warranties, guarantees, or representations, or incur any debt, in the name or on behalf of the other. The Cooperative will not be obligated to the Member for any damages, including any claims made by the Member's employees, to any person or property directly or indirectly arising out of the Member's store's operation or the business conducted by the Member under this Agreement.

21.    This Agreement is not assignable or transferable by the Member without the written consent of the Cooperative and the Company, but Cooperative and the Company shall have the right to assign this Agreement. A Change of Control must be approved in writing by the Cooperative and the Company, such consent not to be unreasonably withheld, conditioned or delayed; provided, however, that the consent of the Cooperative shall not be required for a Change of Control in which the Company (or the Company's assignee) acquires the assets (or equity) of the Member in accordance with paragraph 40.

22.    This Agreement shall continue in force from year to year unless it is terminated as follows:

(a)    The Cooperative shall have the right to immediately terminate this Agreement by written notice to the Member, (i) in the event and at the time or after the Member becomes insolvent, commits any act of bankruptcy, files a voluntary petition in bankruptcy, is adjudicated a bankrupt and the Member does not thereafter reaffirm this Agreement; (ii) if Member breaches any term, condition or obligation under this Agreement or any other agreement with the Cooperative, which breach is not cured within thirty (30) days (ten (10) days in case of nonpayment of accounts receivable statements or any other financial obligations to the Cooperative), or within the applicable cure period in an agreement with the Cooperative after the Member's receipt of written notice of such breach from the Cooperative; or (iii) if Member fails to obtain written consent by the Cooperative and the Company to a Change of Control (assuming such consent is not unreasonably withheld, conditioned or delayed).

(b)    This Agreement may be terminated unilaterally by the Member pursuant to the terms set forth in Article VII, Section 6(a) of the Amended and Restated By-Laws.

(c)    This Agreement may be terminated unilaterally by the Cooperative in connection with the redemption by the Cooperative of all of the Member's Class A common stock pursuant to the terms set forth in Article VII, Section 6(c)(i) of the Amended and Restated By-Laws.

Notwithstanding anything herein to the contrary, paragraphs 10 and 12 shall survive the termination of this Agreement and the Terms and Conditions of Sale and Additional Member Terms and Conditions in effect between the Company and the Member shall survive the termination of this Agreement in accordance with their terms.

23.    This Agreement shall be automatically modified upon notice from the Cooperative to the Member of any relevant change in the Amended and Restated Certificate of Incorporation and/or Amended and Restated By-Laws of the Cooperative, or by resolution of the Board of Directors; *provided, however*, that the Cooperative shall make no amendments to the Specified Provisions (or the definition thereof) that would adversely affect the Company without the prior written consent of the board of managers of TV Holdco, L.L.C.

24.    **The most current form of the Retail Member Agreement as authorized and adopted by the Cooperative's Board of Directors from time to time shall govern all past and present relations, actions or claims arising between the Cooperative and the Member.**

5

25. If any provision of this Agreement is declared invalid under or in conflict with any existing or future law or regulation, such provision shall be modified to conform with that law and such modification shall not affect any other provision of this Agreement which shall continue in full force and effect.

26. The failure on the part of the Cooperative or the Company at any time or times to enforce its rights under this Agreement, its Amended and Restated Certificate of Incorporation, its Amended and Restated By-Laws, any Cooperative policies or procedures, any agreements incorporated herein by reference or any written agreements with Member shall not constitute or be held to be a waiver of any succeeding breach thereof.

27. **The Cooperative and the Member agree that any disputes or disagreements between them, whether arising in contract, tort, or under any other theory of common or statutory law, shall be enforced and resolved against either the Member or the Cooperative only in the state or federal courts located in Cook County or any Illinois county contiguous to Cook County, Illinois, or in the county in Illinois in which the Cooperative's headquarters are then located, and only be interpreted in accordance with the substantive laws of Illinois without giving effect to its conflict of laws principles.**

28. This Agreement may not be modified except as set forth herein or by a writing referencing this Agreement and signed by the Cooperative and the Company.

29. Notwithstanding anything to the contrary contained or referred to in this Agreement, all agreements with the Company prior to the date of the Acquisition (other than Pre-Acquisition Retail Member Agreement, the Subscription for Shares Agreement and the Assignment and Direction) wherein the Member made, had and continues to have an obligation to the Company or its subsidiaries, financial or otherwise, including but not limited to any Personal Guaranty, Security Agreement, Credit Application, Assistance Agreement, Retail Growth Agreement and/or Loan remain in full force and effect. No reference to Member in any Other Member Agreement with the Company shall connote any equity interest or other ownership rights in the Company.

30. The following terms have the meaning set forth below when used herein:

    (a) "Acquisition" has the meaning assigned thereto in the Acquisition Agreement.

    (b) "Acquisition Agreement" means the Acquisition Agreement, dated as of [_____], 2018 (the "Acquisition Agreement") among the Cooperative, the Company, and TV Holdco II, L.L.C. ("Buyer"), pursuant to which Buyer acquired a controlling interest in the Company.

    (c) "Brand Standards" has the meaning set forth in the Terms and Conditions of Sale.

    (d) "Change of Control" has the meaning set forth in Section 39 below.

    (e) "Designated Mark" has the meaning set forth in the Terms and Conditions of Sale.

    (f) "Other Member Agreements" means all documents and instruments that were executed and delivered prior to the date hereof in consideration with the Member's relationship with the Company.

    (g) "Terms and Conditions of Sale" means the Company's terms and conditions of sale which shall govern orders of Merchandise and Services, and licenses of Marks, by a Member.

## ADDITIONAL MEMBER TERMS & CONDITIONS

31. The Company shall sell merchandise of the type typically sold in retail hardware stores, home and garden centers, rented at full service rental centers, or sold to commercial/industrial customers, provide for

6

shipment or delivery of such merchandise to the Member's address on file with the Company, permit use of the service mark identified by the Member's selection below ("Designated Mark") and other permitted Company owned servicemarks, trademarks, collective membership marks, tradenames or brandnames ("Marks") under the conditions of this Agreement and the Terms and Conditions of Sale and offer services to the Member as the Company may decide to offer from time to time. The Member shall utilize the Company as its primary supplier at the Member's retail location identified below ("Retail Location") for the types of merchandise offered by the Company. Subject to the previous sentence, the Member, as an independent retailer, is free to decide how to operate its business, determine what merchandise it will stock, sell or rent and how its store shall be identified utilizing the Designated Mark and additional words or phrases that identify the Retail Location. The Member shall buy from the Company in accordance with the Company's procedures and practices set forth in the Company's Policies and Procedures Manuals (as amended from time to time by Seller) ("Manuals"), which include entering warehouse orders and claims using electronic order entry equipment functionally compatible with the Company's equipment, and entering all other orders using electronic equipment whenever possible. The Member shall honor any warranties or guarantees made to consumers that are placed on Merchandise containing the Company owned Marks. The Member shall abide by all then current the Company policies regarding selling or marketing on the internet. The Member shall notify the Company, in writing, immediately upon any change in business name, address, form, ownership or control.

32. The Member acknowledges that, at the Company's option and sole discretion, any cash payments, rebates, note maturities, interest or other payments owed by the Company to the Member may be applied to amounts owed by the Member to the Company under this Agreement and the Terms and Conditions of Sale and any other agreement between the Member and the Company. Upon termination of this Agreement and the Terms and Conditions of Sale, all invoices on accounts receivable statements and any other financial obligations to the Company or its subsidiaries, including future dated invoices, from the Member to the Company and its subsidiaries shall become immediately due and payable in full. The Member acknowledges that, at the Company's option and sole discretion, any cash payments, rebates, note maturities, interest or other payments owed by the Company to the Member may be applied to amounts owed by the Member to the Company under this Agreement and the Terms and Conditions of Sale and any other agreement between the Member and the Company. Upon termination of this Agreement and the Terms and Conditions of Sale, all invoices on accounts receivable statements and any other financial obligations to the Company or its subsidiaries, including future dated invoices, from the Member to the Company and its subsidiaries shall become immediately due and payable in full. The Member shall provide all financial statements, guarantees, cross collateral and cross default agreements, security agreements and any other supporting materials or documents as may from time to time be requested by the Company in relation to this Agreement and the Terms and Conditions of Sale.

33. The Company shall permit use of the Designated Mark and other Marks under the conditions herein and the Company's brand standards (as amended from time to time by the Company) ("Brand Standards") for so long as the Member is in good standing with the Company and has purchased an aggregate dollar amount of Merchandise from the Company of at least $200,000 in each of the previous three years; provided, however, that if the Member has not satisfied such requirement in the three years prior to the date that this Agreement and the Terms and Conditions of Sale were first agreed to by the Member and the Company, then the Member shall not be subject to such requirement for the next three years provided that the Member continues to purchase, on an annual basis, an aggregate dollar amount of Merchandise from the Company equal to or greater than the Member's average annual purchases of Merchandise over each of the previous three years. If the Member elects to use a Designated Mark, the Member shall pay a monthly brand fee or program fee as set forth in the Brand Standards.

The Member shall establish, operate and maintain a retail hardware store, and/or home or garden center ("Retail Store") retailing merchandise and services to consumers if the Designated Mark is True Value or Home & Garden Showplace, or a full service rental store ("Rental Center") renting appropriate merchandise if the Designated Mark is True Value Rental, or sell commercial/industrial merchandise if the

7

Designated Mark is Induserve ("MRO location") and sell or rent merchandise carrying any of the Company's Marks only at the Retail Location.

The Member's right to use any Designated Mark or other Mark shall be subject to the right and necessity of the Company to control the use of its Designated Mark and other Marks and to maintain the reputation for quality products and services and goodwill associated with such Marks. The Member's right to the display and use of the Designated Mark or any other Marks are permitted only on the following conditions:

(a)     The Designated Mark and any other Marks permitted by the Company are the only the Company owned trademarks or servicemarks which the Member is entitled to use, and the Company may, at its sole discretion, choose to sell merchandise carrying any of the Company's Marks only to the Company's customers who are permitted to use a particular Designated Mark.

(b)     The Designated Mark or any other Marks cannot be used with the trademark or servicemark of any hardware store, home or garden center, building center, rental center or merchandising organization other than the Company's, and may only be used at the Retail Location so long as the Retail Location continues to be an active retail location and as determined to be appropriate by the Company.

(c)     The Member's store and premises will be maintained in a clean and orderly condition.

(d)     If a Retail Store, the Member will offer sufficient breadth and depth of merchandise in the core retail departments to serve the needs of retail consumers. For a hardware store, these departments include: Builders Hardware and Supplies, Cleaning Supplies, Electrical Supplies, Lawn and Garden, Paint and related Sundries, Plumbing, Tools and Home Decor; if a Rental Center, the Member will offer sufficient breadth and depth of rental merchandise to serve the needs of rental consumers; and if a MRO location, the Member will offer sufficient breadth and depth of merchandise sufficient to serve the needs of commercial/industrial consumers.

(e)     If a Retail Store or an MRO location, the Member will maintain a retail inventory of representative quantities of the Company's merchandise as offered, advertised and promoted by the Company.

(f)     The Member's business operations will be conducted in such a fashion as to enhance the reputation of the Company.

(g)     The Member's business operations will be conducted in such a fashion as to enhance the reputation of the Company.

(h)     The Member shall not be entitled to use the Designated Mark or any other Marks as part of its corporate, partnership or limited liability company name, unless the Member used it as such prior to January, 1997.

(i)     The Member shall secure and maintain in force all required licenses, permits, and certificates relating to the conduct of its business pursuant to this Agreement and the Terms and Conditions of Sale

(j)     The Member shall comply with all applicable laws, ordinances and regulations.

(k)     In order to preserve the goodwill in the Designated Mark or Marks, the Member shall in all dealings with its customers, suppliers, the Company, and public officials adhere to high standards of honesty, integrity, fair dealing and ethical conduct and the Member agrees to refrain from any activity which may be injurious to the Company and the goodwill associated with the Designated Mark or Marks.

8

34.     During the term of this Agreement and the Terms and Conditions of Sale, the Member shall not obtain any proprietary rights in the Designated Mark or any other Marks by use thereof. The Member expressly acknowledges and agrees that the license granted under this Agreement and the Terms and Conditions of Sale to use the Designated Mark or any other Mark is non-exclusive and non-transferable, and that the Company has and retains the right to grant other licenses without any limitations as to territory, product, terms or otherwise. Within thirty days of termination of this Agreement and the Terms and Conditions of Sale, the Member shall cease the use of all Marks, including the Designated Mark, and remove, at the Member's expense, all store identification signs and decals which contain any Designated Mark or other Marks and the Member shall cease any display or advertising, directly or indirectly, as a store using the Designated Mark or other Marks, including but not limited to, display in internet web sites and telephone directories. The Member shall further delete the Designated Mark and any other Marks from its business name including, if applicable, the Member's corporate name. The Member shall transfer to the Company, at the Member's expense, any internet domain names which contain the Designated Mark or any other Marks. The Member agrees to confirm in writing thirty days after termination of this Agreement and the Terms and Conditions of Sale that the Member has ceased using the Designated Mark and any other Marks.

35.     If the Member fails to comply with the previous paragraph within the time stated, the Member authorizes and fully empowers the Company, or its agent, at the Member's expense, to enter upon its store property and buildings, and remove all exterior and interior signs, decals and other identification items specified in that paragraph, to withhold any monies due the Member until the terms of this paragraph are complied with and the Member shall pay to the Company not as a penalty but as a hold-over royalty, the sum of $500 per day for each day beyond the thirty days that the Member fails to comply with that paragraph. The Company may, at its option, pursue any and all remedies available to the Company for breach of this provision, including equitable or injunctive relief as well as collect the holdover royalty payment and any other damages. The Member agrees to release, waive and forever discharge the Company from any and all claims, demands, losses and liabilities, of any nature whatsoever, related to the Company's exercise of its rights under this paragraph and the previous paragraph.

36.     The Company may hold Reunions and other meetings from time to time for the purpose of keeping the Company's customers better informed on trends in the industry, presenting merchandise or services available and enabling the Company's customers to exchange ideas with fellow customers.

37.     All information and material furnished or made available to the Member, including without limitation, bulletins, price lists, illustrated catalogs, merchandising and pricing options, computer software, electronic data and the Manuals are confidential property of the Company, developed and promoted for the benefit of the Company's customers, and the Member agrees not to divulge or display any of the information contained in this material to anyone not affiliated with the Company without obtaining the prior written approval of the Company, and not to use such information in a way which is detrimental to the Company or its customers. The Member shall use such information and material only in connection with the Member's purchases from the Company and for the purpose of promoting the Member's business with the Member's customers. The Member acknowledges and confirms that any dissemination or other disclosure of such information and material for any other purpose, or to anyone not affiliated with the Company, shall cause immediate and irreparable harm to the Company. All such information and material shall be immediately returned to the Company upon termination of this Agreement and the Terms and Conditions of Sale.

38.     The Member acknowledges and agrees that (a) the Company has not granted any protected or exclusive territorial or geographical rights to the Member and the Company may, at its sole discretion, accept any other the Member at any location without limitation, (b) the Member may receive different services, charges or freight rates based on the amount of merchandise purchased by the Member, (c) this Agreement and the Terms and Conditions of Sale do not create a fiduciary relationship between the Member and the Company, and that the Member and the Company are and will be independent contractors, and that nothing in this Agreement and the Terms and Conditions of Sale is intended to make either the Company

9

or the Member a general or special agent, joint venturer, partner, or employee of the other for any purpose, (d) it shall identify itself conspicuously in all dealings with customers, suppliers, public officials, store personnel, and others as the independent owner of the Member's store and to place notices of independent ownership on forms, business cards, stationery, advertising and other materials, (e) the Member may not make any express or implied agreements, warranties, guarantees, or representations, or incur any debt, in the name or on behalf of the Company and (f) the Company will not be obligated to the Member for any damages to any person or property directly or indirectly arising out of the Member's store's operation or the business conducted by the Member under this Agreement and the Terms and Conditions of Sale.

39. This Agreement and the Terms and Conditions of Sale are not assignable or transferable by the Member without the written consent of the Company but the Company shall have the right to assign without the Member's consent. Change in control or management of a corporate, partnership or limited liability company the Member, or the sale of all or substantially all of the Member's assets at the Retail Location (other than sale of inventory in the ordinary course of business or transfers of the ownership of a corporate, partnership or limited liability company to affiliates of the Member or Member's family, including for estate planning purposes) (collectively and together with an assignment of this Agreement and the Terms and Conditions of Sale, a "Change of Control") must be approved in writing by the Company.

40. In the event that, at any time prior to the later to occur of (x) the one-year anniversary of the Acquisition and (y) ninety days after the termination of this Agreement, the Member (or the Member's owner(s)) desires to undertake a Change of Control, the Member shall deliver to the Company and the Cooperative a written notice indicating an interest in such Change of Control (the "CoC Notice"). Within thirty (30) days after delivery of the CoC Notice, the Company shall have the right to deliver a written offer to the Member to purchase all, but not less than all, of the Member's assets associated with the Retail Location (or all, but not less than all, of the equity interest in the Member) and providing the Member with the price and other material terms of such proposed purchase (such notice, the "Offer Notice"). Within thirty (30) days following receipt of the Offer Notice, the Member shall have the right to either (x) accept the offer set forth in the Offer Notice and consummate a sale of such assets (or equity) to the Company (or the Company's assignee) or (y) subject to the Company's consent right during the term of this Agreement (such consent not to be unreasonably withheld, conditioned or delayed), decline the Company's offer and attempt to consummate a Change of Control with a third party upon terms which, in the aggregate, are more favorable than those set forth in the Offer Notice and are in no event at a lower price. If the Company does not deliver a timely Offer Notice, or the Member declines the offer set forth in the Offer Notice, the Member will have the right, but not the obligation, for a period of one hundred and eighty (180) days after the date of the CoC Notice (the "CoC Closing Period"), to effect a Change of Control with any third party, upon terms which, in the aggregate, are not more favorable to the purchaser than those set forth in the Offer Notice and are in no event at a lower price. If a Change of Control does not close within the CoC Closing Period, then any future Change of Control shall be subject to this paragraph. If the Company timely delivers an Offer Notice and the Member accepts the offer set forth in the Offer Notice, then the Company and the Member shall cooperate in good faith to consummate the sale of assets (or equity) on the terms set forth in the Offer Notice as promptly as possible after the Company's exercise of its right of first offer.

41. Any Change of Control or attempted Change of Control in violation of this Agreement shall be void ab initio.

42. This Agreement and the Terms and Conditions of Sale, including any addenda and any other agreement which the Member signs with the Company, is the entire and complete agreement between the Member and the Company and there are no prior agreements, representations, promises, or commitments, oral or written, which are not specifically contained in this Agreement and the Terms and Conditions of Sale or any other agreement which the Member signs with the Company. The most current form of this Agreement and the Terms and Conditions of Sale shall govern all past and present relations, actions or claims arising between the Company and the Member. This Agreement and the Terms and Conditions of Sale may not

10

be modified except as set forth herein or by a writing referencing this Agreement and the Terms and Conditions of Sale and signed by the Company.

43.  Should any provision of this Agreement and the Terms and Conditions of Sale be declared invalid under or in conflict with any existing or future law or regulation such provision shall be modified to conform with that law and such modification shall not affect any other provision of this Agreement and the Terms and Conditions of Sale which shall continue in full force and effect.

44.  The failure on the part of the Company at any time or times to enforce its rights under this Agreement and the Terms and Conditions of Sale, its Manuals, any the Company policies or procedures, or any written agreements with the Member shall not constitute or be held to be a waiver of any succeeding breach thereof.

45.  In connection with any public offering of securities of TV Holdco, L.L.C. or any of its subsidiaries or any of their successors, Customer agrees that it will not sell or otherwise dispose of any such securities issued to Customer by such entity for a period equal to any such period applicable to any other investor in TV Holdco, L.L.C.

46.  Paragraphs 32, 35, 39, 40, 41, 42, 43, 44 and 45 shall survive the termination of this Agreement.

11

WITNESS the Member's hand and seal this _____ day of _____, 20____

| | |
|---|---|
| | Member Entity |

d/b/a _____

Retail Location Address:

City _____ State _____ Zip _____

By: _____
Print Name of Authorized Person

Title: _____

_____
Signature of Authorized Person

Select a Designated Mark subject to the monthly brand fee:

_____ True Value          _____ Home & Garden Showplace          _____ Induserve          _____ No brand desired

_____ Rental

Date:

## ACCEPTANCE BY TV COOPERATIVE COMPANY

ACCEPTED this _____ day of_____, 20 _____, at Chicago, Illinois,

By TV COOPERATIVE COMPANY, by its duly authorized agent.

_____

_____ Title

## ACCEPTANCE BY TRUE VALUE COMPANY, L.L.C.

SOLELY WITH RESPECT TO THE SPECIFIED PROVISIONS, ACCEPTED this ____day of__, 20
_____, at Chicago, Illinois,

By TRUE VALUE COMPANY, L.L.C., by its duly authorized agent.

_____

_____ Title

*Annex I*

## TRUE VALUE COMPANY, L.L.C.

### TERMS AND CONDITIONS OF SALE

True Value Company, L.L.C. ("Seller") is a wholesale distributor selling various products ("Products"). You ("Customer") desire to purchase Products from Seller. Customer and Seller agree that the following Terms and Conditions of Sale ("Terms") shall apply to Customer's purchase of Products from Seller.

### COMPLETE TERMS

Sales by Seller are governed by these Terms. Seller objects to any different or additional terms. Seller reserves the right to change these Terms any time upon general notice on Seller's website that the Terms have changed and Customer's continued purchases from Seller constitutes acceptance of the Terms as changed. Seller's Policies and Procedures Manuals (as amended from time to time by Seller) ("Manuals") are incorporated herein and shall constitute a part of these Terms.

### PRICE AND PAYMENT

The price to be paid by Customer to Seller shall be as set forth on Seller's statements. Prices are subject to change. Payment terms shall be as set forth on Seller's statements to Customer.

Customer shall pay in full on the date due all invoices on accounts receivable statements and any other financial obligations to Seller or its subsidiaries. A finance charge of one and one-half percent (1½%) per month will be applied to any unpaid balance after thirty (30) days. In the event that collection efforts are necessary, Seller shall be entitled to the recovery of all costs and expenses, including attorneys' fees.

### VOLUME REBATE

If Customer has purchased Products from Seller during the calendar year, Customer may be eligible for a volume rebate on qualifying purchases from Seller's regional distribution centers ("Net Handled Purchases") excluding opening stock orders (OSOs) and direct ship merchandise. Volume rebates will be calculated and paid for each store location and purchases may not be aggregated between or among stores. Volume rebates will be earned as set forth in the Manuals.

### GROWTH REBATE

If Customer has purchased Products from Seller for one (1) full calendar year, Customer may be eligible for a growth rebate on Net Handled Purchases (as defined above) as set forth in the Manuals. Growth rebates will be calculated and paid on an aggregated store location basis.

### LICENSE OF MARKS

Seller shall permit use of Seller-owned servicemarks, trademarks, trade names or brand names under the Seller's brand standards (as amended from time to time by the Seller) ("Brand Standards"). If Customer elects to use a Designated Mark, Customer shall pay a monthly brand fee or program fee as set forth in the Brand Standards.

### SELLER INFORMATION

All information and material furnished or made available to Customer, including without limitation, bulletins, price lists, illustrated catalogs, merchandising and pricing options, computer software, electronic data and the Manuals are confidential property of Seller, developed and promoted for the benefit of the Seller's customers, and Customer agrees not to divulge or display any of the information contained in this material to anyone not affiliated with Seller without obtaining the prior written approval of Seller, and not to use such information in a way which is detrimental to Seller or its customers. Customer shall use such information and material only in connection with Customer's purchases from Seller and for the purpose of promoting Customer's business with Customer's customers. Customer

acknowledges and confirms that any dissemination or other disclosure of such information and material for any other purpose, or to anyone not affiliated with Seller, shall cause immediate and irreparable harm to Seller. All such information and material shall be immediately returned to Seller upon termination of these Terms. Customer's obligations in this section will survive the termination of these Terms.

## ACKNOWLEDGEMENTS

Customer acknowledges and agrees that (a) Seller has not granted any protected or exclusive territorial or geographical rights to Customer and Seller may, at its sole discretion, accept any other Customer at any location without limitation, (b) Customer may receive different services, charges or freight rates based on the amount of merchandise purchased by Customer, (c) these Terms do not create a fiduciary relationship between Customer and Seller, and that Customer and Seller are and will be independent contractors, and that nothing in these Terms is intended to make either Seller or Customer a general or special agent, joint venturer, partner, or employee of the other for any purpose, (d) it shall identify itself conspicuously in all dealings with customers, suppliers, public officials, store personnel, and others as the independent owner of Customer's store and to place notices of independent ownership on forms, business cards, stationery, advertising and other materials, (e) Customer may not make any express or implied agreements, warranties, guarantees, or representations, or incur any debt, in the name or on behalf of Seller, (f) Seller will not be obligated to Customer for any damages to any person or property directly or indirectly arising out of Customer's store's operation or the business conducted by Customer under these Terms, and (g) Customer shall honor any warranties or guarantees made to consumers that are placed on Products containing Seller owned Marks.

## TERMINATION/DEFAULT

These Terms shall continue in force from year to year unless terminated as set forth in the following paragraphs.

Customer will be in default if (a) Customer fails to pay Seller any amount when due; (b) Customer fails for a period of five (5) days after receiving written notice from Seller to fulfill or perform any provisions of these Terms (other than the prior provision relating to due date of payments); (c) Customer becomes insolvent or bankrupt, or a petition therefore is filed voluntarily or involuntarily and not dismissed within thirty (30) days from filing; (d) Customer makes a general assignment for the benefit of its creditors, or a receiver is appointed, or a substantial part of Customer's assets are attached or seized under legal process and not released within thirty days thereafter or (e) Customer fails to obtain written consent of Seller to an assignment of these Terms.

Upon Customer's default, Seller may, at its option, without prejudice to any of its other rights and remedies, and without demand for payments past due, (a) make shipments subject to cash in advance; (b) terminate these Terms and declare immediately due and payable the obligations of Customer for products previously shipped; (c) demand reclamation; or (d) suspend any further deliveries until the default is corrected, without releasing Customer from its obligations herein. In any event, Customer shall remain liable for all loss and damage sustained by Seller because of Customer's default.

In addition, either Party may terminate these Terms upon sixty (60) days' notice.

## LIMITATION OF LIABILITY

**SELLER MAKES NO WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, WRITTEN OR ORAL, WITH RESPECT TO THE PRODUCTS SOLD BY SELLER, INCLUDING WITHOUT LIMITATION, ANY WARRANTY AS TO DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY OF MATERIALS OR WORKMANSHIP, MERCHANTABILITY, FITNESS FOR ANY PURPOSE, USE OR OPERATION, SAFETY, PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENT, OR TITLE. IN NO EVENT SHALL SELLER BE LIABLE TO BUYER OR ANY OTHER THIRD PARTY FOR THE PAYMENT OF ANY CONSEQUENTIAL, INDIRECT, OR SPECIAL DAMAGES, INCLUDING WITHOUT LIMITATIONS, LOST PROFIT.**

**SELLER HAS NOT REPRESENTED TO CUSTOMER THAT A "MINIMUM", "GUARANTEED", OR "CERTAIN" INCOME CAN BE EXPECTED OR REALIZED. SUCCESS DEPENDS, IN PART, ON**

2

CUSTOMER DEVOTING DEDICATED PERSONAL EFFORTS TO THE BUSINESS AND EXERCISING GOOD BUSINESS JUDGMENT IN DEALINGS WITH CUSTOMERS, SUPPLIERS, AND EMPLOYEES. CUSTOMER ALSO ACKNOWLEDGES THAT NEITHER SELLER NOR ANY OF ITS EMPLOYEES OR AGENTS HAS REPRESENTED THAT CUSTOMER CAN EXPECT TO ATTAIN ANY SPECIFIC SALES, PROFITS, OR EARNINGS. IF SELLER HAS PROVIDED ESTIMATES TO CUSTOMER, SUCH ESTIMATES ARE FOR INFORMATIONAL PURPOSES ONLY AND DO NOT REPRESENT ANY GUARANTEE OF PERFORMANCE BY SELLER TO CUSTOMER. SELLER MAKES NO REPRESENTATIONS OR WARRANTIES EITHER EXPRESS OR IMPLIED REGARDING THE PERFORMANCE OF CUSTOMER'S BUSINESS.

GOVERNING LAW; JURISDICTION

Any dispute, claim or controversy arising out of these Terms will be governed by Illinois law, without regard to choice of law rules. The parties hereby agree and consent to the exclusive jurisdiction of the state and federal courts located in Cook County, Illinois or in any other Illinois county contiguous to Cook County, Illinois or in the county in Illinois in which the Seller's headquarters are then located.

ASSIGNMENT

These Terms are not assignable or transferable by Customer without the written consent of Seller but Seller shall have the right to assign without Customer's consent.

[Remainder of page intentionally left blank]

WDC - 004951/000025 - 11572142 v6

IN WITNESS WHEREOF, the parties have executed these Terms as of the dates set forth below.

_____     _____
Customer                                Seller

Date: _____

*Execution Version*

# AMENDED AND RESTATED

# BY-LAWS

# OF

# TV COOPERATIVE COMPANY

WDC - 044951/000025 - 1166E120 v6
AmericasActive:11528211.15



# BY-LAWS

## OF

## TV COOPERATIVE COMPANY

### Amended and restated as of [_____, 2018]

### ARTICLE I

### OFFICES

**SECTION 1. OFFICE IN DELAWARE.** The registered office of the Corporation in the State of Delaware shall be located in the City of Wilmington, County of New Castle.

**SECTION 2. ADDITIONAL OFFICES.** The principal office of the Corporation in the State of Illinois shall be located at 8600 West Bryn Mawr Avenue in the City of Chicago, County of Cook. The Corporation may have such other office or offices within or without the State of Illinois as the Board of Directors may from time to time determine or the business of the Corporation may require.

### ARTICLE II
### PURPOSE

**SECTION 1. PURPOSE.** The Corporation shall be organized and operated on a cooperative basis for the holders of its Class A Common Stock (who are its Members). The nature of the business, or objects or purposes to be transacted, promoted or carried on are:

To manufacture, purchase or otherwise acquire, invest in, own, mortgage, pledge, sell, assign and transfer or otherwise dispose of and trade and deal with goods, wares and merchandise and personal property of every class description, including, but not limited to:

|     |     |
| --- | --- |
| (a) | hardware, goods, tools and related products; |
| (b) | building materials and related products; |
| (c) | paints and paint sundries and related products; |
| (d) | lawn and garden products, supplies, and tools; |
| (e) | farming, home and garden maintenance supplies and related products; |
| (f) | automotive and related products; |
| (g) | variety, crafts, houseware goods, appliances, sporting goods, and related products; and |
| (h) | musical instruments and related products. |

To acquire, hold, use, sell, assign, lease, grant licenses in respect of, and otherwise deal in and dispose of letters patent of the United States or any other foreign country, patent rights, licenses and privileges, inventions, improvements and processes, copyrights, trademarks and trade names incident to or useful in connection with any business of this Corporation.

To acquire the capital stock, bonds or other evidences of indebtedness, secured or unsecured, of any other corporation or other entity and to acquire the goodwill, rights, assets and property and to undertake and assume all or any part of the obligations or liabilities of any other corporation or other type of entity, firm, association or person.

To acquire by purchase, subscription or otherwise, and to receive, hold, own, guarantee, sell, assign, exchange, transfer, mortgage, lease, pledge or otherwise dispose of or deal in and with any personal or real property, or any of the shares of the capital stock, or any voting trust certificates in respect of the shares of capital stock, scripts, warrants, rights, bonds, debentures, notes, trust receipts and other securities, obligations, choses in action and evidences of indebtedness or created by any corporations,

2

joint stock companies, syndicates, associations, firms, trusts or persons, public or private, or by the government of the United States of America, or by any foreign government, or by any state, territory, province, municipality or other political subdivision or by any governmental agency, and as owner thereof to possess and exercise all the rights, powers and privileges of ownership, including the right to execute consents and vote thereon, and to do any and all acts and things necessary or advisable for the preservation, protection, improvement and enhancement in value thereof.

To enter into, make and perform contracts of every kind and description with any person, firm, association, corporation, municipality, county, state, body politic or government or colony or dependence thereof.

To borrow or raise moneys for any of the purposes of the Corporation and, from time to time without limit as to amount, to draw, make, accept, endorse, execute and issue promissory notes, drafts, bills of exchange warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of any thereof and of the interest thereon by mortgage upon or pledge, conveyance or assignment in trust of the whole or any part of the property of the Corporation, whether at the time owned or thereafter acquired, and to sell, pledge or otherwise dispose of such bonds or other obligations of the Corporation for its corporate purposes.

To purchase, hold, sell and transfer the shares of its own capital stock; provided it shall not use its funds or property for the purchase of its own shares of capital stock when such use would cause any impairment of its capital except as otherwise permitted by law and provided further that shares of its own capital stock belonging to it shall not be voted upon directly or indirectly.

To engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware ("DGCL").

**ARTICLE III**
**MEETINGS OF STOCKHOLDERS**

**SECTION 1. PLACE OF MEETINGS.** All meetings of the stockholders for the election of directors or for any other purposes shall be held at such location, within or without the State of Delaware, as the Board of Directors may from time to time designate and shall be held at such time as shall be stated in the notice of the meeting, or in a duly executed waiver of notice thereof.

**SECTION 2. DATE AND TIME OF ANNUAL MEETING.** An annual meeting of stockholders shall be held on a date and at a time designated by resolution of the Board of Directors and such date and time shall be stated in the notice to stockholders of the meeting, or in a duly executed waiver of such notice. At the annual meeting, the holders of Class A Common Stock shall elect by ballot directors of the Board of Directors and transact such other business as may properly be brought before the meeting.

**SECTION 3. STOCKHOLDERS' PROPOSALS.** To bring a proposal to be voted upon at the annual meeting of stockholders, a stockholder of record must do so by submitting adequate notice, as described herein, to the Secretary of the Corporation, at its principal office, for receipt no later than ninety (90) days prior to the annual meeting. In no event shall an adjournment of an annual meeting commence a new time period for the giving of adequate notice. Such notice shall be signed and dated by the stockholder of record and shall state the name and address of the stockholder, a representation that the stockholder is a holder of record of shares of the Corporation entitled to vote at the meeting and intends to appear in person or by proxy at the meeting to make the proposal, a brief description of the proposal desired to be brought before the meeting, the reasons for requesting the proposal, and any material interest that the stockholder or any beneficial owner(s) may have in the outcome of the proposal. Any proposal must (i) relate to operations which account for at least five percent (5%) of either the Corporation's total assets or gross sales, (ii) be otherwise deemed by the Corporation significantly related to its business operations, and (iii) be determined, in the discretion of the Board of Directors, or the chairman of the Board of Directors if the Board of Directors so designates, to be in the best interest of the Corporation. A proposal that does not meet these requirements shall not be presented for stockholder vote.

3

**SECTION 4. NOTICE OF ANNUAL MEETING.** Written notice of the annual meeting shall be served upon, either personally or by any electronic communication, or mailed to each stockholder entitled to vote thereat at such address as appears on the books of the Corporation, at least ten (10) days prior to the meeting, or such longer period of time as may be required by law.

**SECTION 5. LIST OF STOCKHOLDERS.** Unless required by law, no stockholder shall be entitled to receive a list of the stockholders.

**SECTION 6. SPECIAL MEETINGS.** Special meetings of the stockholders, for any purpose or purposes, unless otherwise prescribed by statute or by Certificate of Incorporation, may be called by the chairman of the Board of Directors with the approval of a majority of the Board of Directors, or may be called by the president, and shall be called by the president or secretary at the request in writing of a majority of the Board of Directors, or at the request in writing of stockholders owning at least ten percent (10%) of the shares of voting stock of the Corporation issued and outstanding and entitled to vote. Such request shall state the purpose or purposes of the proposed meeting.

**SECTION 7. NOTICE OF SPECIAL MEETINGS.** Notice of a special meeting of stockholders, stating the time and place and object thereof, shall be served upon, either personally or by any electronic communication, or mailed, at least twenty (20) days before such meeting, to each stockholder entitled to vote thereat at such address as appears on the books of the Corporation.

**SECTION 8. BUSINESS AT SPECIAL MEETINGS.** Business transacted at all special meetings shall be confined to the objects stated in the call.

**SECTION 9. QUORUM; ADJOURNMENTS.** The holders of one-third of the stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of the stockholders for the transaction of business, except as otherwise provided by statute, by the Certificate of Incorporation or by these By-Laws. If, however, a quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented any business may be transacted which might have been transacted at the meeting as originally called. When a quorum is present or represented at any meeting, the vote of the holders of a majority of the stock having voting power present in person or represented by proxy shall decide any question brought before such meeting, unless the question is one upon which by express provision of the statutes or of the Certificate of Incorporation or of these By-Laws a different vote is required, in which case such express provision shall govern and control the decision of such question.

**SECTION 10. VOTING; NO PRE-EMPTIVE RIGHTS.** At any meeting of the stockholders every stockholder of record having the right to vote shall be entitled to vote in person, or by proxy appointed by an instrument in writing subscribed by such stockholder and bearing a date not more than three (3) years prior to said meeting, unless said instrument provides for a longer period. Each share of Class A Common Stock shall be entitled to one (1) vote for all purposes. No holder of any class of stock of the Corporation shall have any pre-emptive or preferential right to subscribe to or purchase any shares of stock of the Corporation or shares or securities of any kind, either convertible into or evidencing the right to purchase any shares of stock of the Corporation, other than such thereof, if any, as the Board of Directors in its discretion may from time to time determine.

**ARTICLE IV**
**DIRECTORS**

**SECTION 1. NUMBER; TERM.** The number of directors which shall constitute the whole Board of Directors shall be not less than three (3) nor more than sixteen (16). To be eligible to serve as a director, a director must be (i) a current Member of the Corporation or possess an ownership interest in a Member

4

and actively participate in the business of a Member or (ii) a non-member approved by the Board of Directors.

Within the limits above specified, the number of directors shall be determined by resolution of the Board of Directors. The directors shall be elected at the annual meeting of the stockholders to serve for a term of one (1) year, except as provided in section 4 of this Article, so that the term of office of each director shall expire in the following year, and each director shall hold office for the term elected and until a successor shall be elected and shall qualify, except in the event of death, resignation, retirement, disqualification or removal of a director where termination shall be immediate.

**SECTION 2. CHAIRMAN OF THE BOARD.** The Board of Directors shall annually elect a chairman of the board. Unless otherwise resolved, each chairman elect's term shall commence as the first order of business at the meeting of the Board of Directors immediately following the annual stockholders' meeting. The chairman of the Board of Directors shall preside at all meetings of the stockholders and directors. The chairman shall perform all duties incident to the position of chairman of the Board of Directors and such other duties as may be prescribed by the Board of Directors from time to time.

**SECTION 3. PLACE OF MEETINGS.** The directors may hold meetings and to the extent permitted by law keep the books of the Corporation outside of Delaware, at such places as they may from time to time determine.

**SECTION 4. VACANCIES.** If any vacancies occur in the Board of Directors, caused by death, resignation, retirement, disqualification or removal from office of any directors or otherwise, or any new directorship is created by any increase in the authorized number of directors, a majority of the directors then in office, though less than a quorum, may choose a successor or successors, or fill the newly created directorship and the directors so chosen shall hold office for the remainder of the unexpired term.

**SECTION 5. GENERAL POWERS.** The property and business of the Corporation shall be managed by its Board of Directors which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by applicable law, the Certificate of Incorporation or by these By-Laws directed or required to be exercised or done by the stockholders.

**SECTION 6. FIRST MEETING.** The first meeting of each newly elected Board of Directors shall be held immediately following the annual meeting of stockholders, within or without the State of Delaware and no notice of such meeting shall be necessary to the newly elected directors in order legally to constitute the meeting, provided a quorum shall be present, or they may meet at such place and time as shall be fixed by the consent in writing of all the directors.

**SECTION 7. REGULAR MEETING.** Regular meetings of the Board of Directors may be held without notice at such time and place either within or without the State of Delaware as shall from time to time be determined by the Board of Directors.

**SECTION 8. SPECIAL MEETINGS.** Special meetings of the Board of Directors may be called by the chairman, chief executive officer, secretary, or any director on five (5) days' notice to each director, either personally, by telephone, by any electronic communication, or by mail. Special Board of Directors meetings may take place by any means through which all participating directors can hear each other, when properly called.

**SECTION 9. QUORUM.** At all meetings of the Board of Directors a majority of the directors then in office and entitled to vote shall constitute a quorum for the transaction of business and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board of Directors, except as may be otherwise specifically provided by statute or by the Certificate of Incorporation or by these By- Laws. If a quorum shall not be present at any meeting of directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

5

**SECTION 10. AGENDAS AND MINUTES.** Agendas for all regular meetings shall be delivered, either personally or by any electronic communication, or mailed at least five (5) days before the date of each such meeting. Minutes of each meeting of the Board of Directors shall be approved at the next regular meeting. They shall be attested to by the chairman and the Secretary.

**SECTION 11. COMPENSATION.** Directors shall not receive a salary for their services as directors, but, by resolution of the Board of Directors, expenses of attendance at meetings will be paid; provided that nothing herein contained shall be construed to preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.

**SECTION 12. COMMITTEES.** The Board of Directors may by resolution or resolutions passed by a majority of the entire Board of Directors designate one (1) or more committees, each committee to consist of three (3) or more of the directors of the Corporation, which, to the extent provided in said resolution or resolutions, shall have and may exercise the powers of the Board of Directors in the management of the business and affairs of the Corporation. Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the Board of Directors. A majority of the members of any such committee may determine its action and fix the time and place of its meetings unless the Board of Directors shall otherwise provide. The Board of Directors shall have the power at any time to fill vacancies in, to change the membership of, or to dissolve any committee. Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

**ARTICLE V**
**NOTICES**

**SECTION 1. FORM; DELIVERY.** Whenever applicable law or the Certificate of Incorporation or these By-Laws requires notice to any director or stockholder, it shall not be construed to mean personal notice, but such notice may be given in writing, by telephone, by any electronic communication, or by mail addressed to such director or stockholder at such address as appears on the books of the Corporation, and such notice shall be deemed to be given at the time when the same shall be thus delivered, conveyed by telephone call, entered into the electronic process or mailed.

**SECTION 2. WAIVER.** Whenever any notice is required, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent thereto.

**ARTICLE VI**
**OFFICERS**

**SECTION 1. OFFICERS.** The officers of the Corporation shall be elected by the Board of Directors and shall be a chief executive officer, a president, a vice president, a secretary and a treasurer. The Board of Directors may also elect additional vice presidents and one (1) or more assistant secretaries and assistant treasurers. Two (2) or more offices may be held by the same person. Only the persons elected by the Board of Directors shall be "officers" of the Corporation entitled to advancement of expenses pursuant to Article XIII, Section 2 of the Corporation's By-laws.

**SECTION 2. OTHER OFFICERS AND AGENTS.** The Board of Directors may elect such other officers as it shall deem necessary, who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Directors. All elected officers shall have power to sign certificates for shares of the Corporation, deeds, mortgages, bonds, contracts, loans, and any other instruments which the Board of Directors has authorized to be executed.

**SECTION 3. SALARIES.** The salaries of the chief executive officer and president of the Corporation shall be fixed by the Board of Directors.

6

**SECTION 4. TENURE AND REMOVAL.** Any officer elected or appointed by the Board of Directors may be removed at any time by the affirmative vote of a two-thirds (2/3) majority of the entire Board of Directors, with or without cause, and without prejudice to any of such officer's contract rights. If the office of any officer becomes vacant, the vacancy may be filled by the Board of Directors.

**SECTION 5. PRESIDENT AND CHIEF EXECUTIVE OFFICER.** The president shall be the chief executive officer, and shall perform all duties incident to the offices of president and chief executive officer and such other duties as shall from time to time be assigned by the Board of Directors, and shall report to the Board of Directors on the affairs, performance and direction of the Corporation.

**SECTION 6. VICE PRESIDENTS.** The Vice Presidents shall perform the duties and exercise the powers of their offices, and shall perform such other duties as the Board of Directors shall require.

**SECTION 7. SECRETARY.** The Secretary shall attend all sessions of the Board of Directors and all meetings of the stockholders and record and preserve all votes and the minutes of all proceedings for the corporation's records. The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors, shall be the keeper of corporate records and shall perform such other duties as may be prescribed by the Board of Directors, chief executive officer, or president, under whose supervision the Secretary shall act.

**SECTION 8. ASSISTANT SECRETARIES.** The assistant secretaries shall, in the absence or disability of the secretary, perform the duties and exercise the powers of the secretary and shall perform such other duties as the secretary and Board of Directors shall require.

**SECTION 9. TREASURER.** The treasurer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors.

The treasurer shall manage the funds of the Corporation, and shall report at the regular meetings of the Board of Directors, or whenever the Board of Directors may require it, an account of all transactions as treasurer and of the financial condition of the Corporation.

If required by the Board of Directors, the treasurer shall give the Corporation a bond (which shall be renewed every six (6) years) in such sum and with such surety as shall be required for the full and faithful performance of the duties of office, and for restoration to the Corporation of all books, papers, checks, money and other property of whatever kind in the treasurer's possession or control belonging to the Corporation.

**SECTION 10. ASSISTANT TREASURERS.** The assistant treasurers shall, in the absence or disability of the treasurer, perform the duties and exercise the powers of the treasurer and shall perform such other duties as the treasurer and Board of Directors shall prescribe.

7

## ARTICLE VII

## CERTIFICATES OF STOCK AND CERTAIN QUALIFICATIONS, LIMITATIONS AND RESTRICTIONS OF CAPITAL STOCK

**SECTION 1. STOCK CERTIFICATES.** The certificates of stock of the Corporation shall be consecutively numbered and shall be entered on the books of the Corporation as they are issued. They shall exhibit the holder's name and number of shares and shall be signed by an officer. The designations, preferences and relative, participating, optional or other special rights of each class of stock and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificates which the Corporation shall issue to represent such class of stock. If any stock certificate is signed (1) by a transfer agent or an assistant transfer agent or (2) by a transfer clerk acting on behalf of the Corporation and a registrar, the signature of any such officer may be by facsimile.

**SECTION 2. LOST CERTIFICATES.** The Board of Directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the Corporation alleged to have been lost or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost or destroyed. When authorizing such issue of a new certificate or certificates, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost or destroyed certificate or certificates, or the owner's legal representative, to advertise the same in such manner as it shall require and/or give the Corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the Corporation with respect to the certificate alleged to have been lost or destroyed.

**SECTION 3. TRANSFER OF SHARES.** Subject to the qualifications, limitations and restrictions set forth in the Certificate of Incorporation and these By-Laws, upon surrender to the Corporation, or the transfer agent of the Corporation, of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, it shall be the duty of the Corporation to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

**SECTION 4. CLOSING OF TRANSFER BOOKS.** In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders, or to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may, except as otherwise required by law, fix a record date, which record date shall not precede the date on which the resolution fixing the record date is adopted and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of any meeting of stockholders, nor more than sixty (60) days prior to the time for such other action as hereinbefore described; provided, however, that if no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held, and, for determining stockholders entitled to exercise any rights of change. conversion or exchange of stock or for any other purpose, the record date shall be at the close of business on the day on which the Board of Directors adopts a resolution relating thereto.

A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

**SECTION 5. REGISTERED STOCKHOLDERS.** The Corporation shall be entitled to treat the holder of record of any share or shares of stock as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

8

**SECTION 6. REDEMPTION OR CONVERSION OF STOCK.**

(a) **REDEMPTION OR CONVERSION ON MEMBER TERMINATION.** Upon termination of a Member Agreement (as referred to in Article VIII hereof) for any reason whatsoever, the stockholder associated therewith shall sell to the Corporation and the Corporation shall redeem from such stockholder all of such stockholder's Class A Common Stock upon the terms and conditions set forth in Section 7 of this Article VII. Such a redemption may be effected through a conversion of such stockholders shares of Class A Common Stock into Class B Common Stock upon the terms and conditions set forth in Section 7 of this Article VII.

(b) **STOCKHOLDER PUT RIGHT.** Within ten (10) days after each receipt by the Corporation of a Put Eligibility Notice (as defined in the TV Holdco LLC Agreement) from TV Holdco, the Corporation shall deliver to each stockholder identified in such Put Eligibility Notice as a Qualifying Customer (as defined in the TV Holdco LLC Agreement) a notice (the "Qualifying Customer Put Eligibility Notice") of such stockholder's right to cause the Corporation to purchase shares of such stockholder's Class A Common Stock and Class B Common Stock. Such stockholder's right to cause the Corporation to purchase shares shall be limited to only (A) Class A Shares and Class B Shares that were outstanding on the Effective Date (as defined in the TV Holdco LLC Agreement), and (B) Class B Shares that were issued in exchange for Class A Shares that were outstanding on the Effective Date. The Qualifying Customer Put Eligibility Notice shall include an election form (the "Stockholder Election Form") that stockholder shall complete and return to the Corporation within twenty (20) days following the Corporation's delivery of the Qualifying Customer Put Eligibility Notice (the "Put Notice Deadline") in the event stockholder elects to sell any shares of its Class A Common Stock and Class B Common Stock to the Corporation pursuant to this Section 6(b). On the Stockholder Election Form, the stockholder shall indicate the number of shares of its Class A Common Stock and Class B Common Stock that stockholder has elected to sell to the Corporation (for each stockholder, the number and type of such shares is referred to herein as the "Put Class A Shares" and the "Put Class B Shares", as applicable; the Put Class A Shares and Put Class B Shares are referred to herein, together, as the "Put Shares"). Any stockholder that does not complete and return to the Corporation a Stockholder Election Form by the Put Notice Deadline shall be deemed to have elected to not sell any shares of its Class A Common Stock or Class B Common Stock to the Corporation pursuant to this Section 6(b) with respect to the applicable Put Eligibility Notice. Stockholders that duly and timely complete and return to the Corporation a Stockholder Election Form shall be referred to herein, for the applicable Put Eligibility Notice, an "Electing Stockholder". By no later than the 60th day following the Corporation's receipt of a Put Eligibility Notice, the Corporation shall deliver to TV Holdco a Put Notice (as defined in the TV Holdco LLC Agreement) setting forth (i) a list of the Qualifying Customers that have elected to sell shares of Class A Common Stock and Class B Common Stock to the Corporation with respect to such Put Eligibility Notice, (ii) the number of Put Class A Shares and Put Class B Shares, (iii) an amount (the "Aggregate Put Purchase Price") equal to the product of (x) $100 and (y) the aggregate number of Put Shares and (iv) the number of Class B Units in TV Holdco that the Corporation elects to sell to TV Holdco, which number of Class B Units shall equal the quotient of (A) the Aggregate Put Purchase Price divided by (B) $1.00. Within thirty (30) days following TV Holdco' purchase from the Corporation of Class B Units pursuant to Section 3.9 of the TV Holdco LLC Agreement, the Corporation shall deliver a written notice to each Electing Stockholder setting forth (I) the number of Class B Units purchased by TV Holdco with respect to the Put Eligibility Notice, (II) the amount of the consideration therefor paid by TV Holdco in cash (the "Cash Portion"), (III) the amount of the consideration therefor paid by TV Holdco's issuance to the Corporation of a Put Option Note (as defined in the TV Holdco LLC Agreement) (the percentage calculated by dividing the Cash Portion by the Aggregate Put Purchase Price paid by TV Holdco is referred to herein as the "Cash Percentage"), (IV) the number of Put Class A Shares and Put Class B Shares that the Corporation shall purchase from such Electing Stockholder (for each Electing Stockholder, the "Purchased Put Shares"), and (V) the amount of the purchase price that the Corporation shall pay to such Electing Stockholder for its Purchased Put Shares in cash and/or by the Corporation's issuance of a promissory note.

9

(c) **CORPORATION RIGHTS OF REDEMPTION OR CONVERSION.**

(i) <u>Involuntary Termination of Member</u>. Whenever the Board of Directors shall by the affirmative vote of two-thirds or more of the directors then in office decide that it is in the best interests of the Corporation that any stockholder shall cease to be associated with the Corporation as a member, the Corporation shall have the right, upon written demand addressed to such stockholder at the address as shown on the books of the Corporation, to purchase all (but not less than all) of such stockholder's shares of Class A Common Stock, upon the terms and conditions set forth in section 7 of this Article VII. Such a redemption may be effected through a conversion of such stockholders shares of Class A Common Stock into Class B Common Stock upon the terms and conditions set forth in Section 7 of this Article VII.

(ii) <u>Optional Redemption</u>. The Corporation shall have the right to purchase, in cash, all or any portion of outstanding shares of capital stock of the Corporation and other forms of written notices of allocation.

(d) **NOTICE OF REPURCHASE RIGHTS.** The right or obligation of purchase or redemption hereby reserved to the Corporation may be stated in the subscription agreement under which the Corporation's stock is sold or in the Member Agreement.

(e) **REPURCHASE RIGHTS NOT EXCLUSIVE.** The right or obligation of purchase or redemption provided for in this Section 6 of Article VII of the By-Laws is in addition to, and not in derogation of, the rights reserved to the Corporation by the provisions of Article Fourth of the Certificate of Incorporation and any other rights to repurchase, redeem or otherwise acquire its stock that the Corporation may now have or ever obtain.

**SECTION 7. MECHANICS, TERMS AND CONDITIONS OF REDEMPTION OR CONVERSION.** Any purchase or redemption or conversion of shares of stock of this Corporation made pursuant to Section 6 hereof or the Certificate of Incorporation, unless expressly provided otherwise, shall proceed as follows within thirty (30) days of the Corporation providing notice of such purchase or redemption or conversion:

(a) **TERMINATION OF RIGHTS AND PRIVILEGES AS STOCKHOLDER.** Upon the effective date of the purchase or redemption or conversion or upon such other date set by these By-Laws, the Certificate of Incorporation, or as agreed between the stockholder and the Corporation, whichever shall be appropriate in the circumstances, all of the Corporation's stock that is purchased or redeemed or converted (the "<u>Redeemed Shares</u>") shall be deemed to be and shall be and become the property of the Corporation; from and after such date all rights and privileges incident to the ownership of the Redeemed Shares shall cease, except only the right to receive the purchase price for such Redeemed Shares (or converted) and, in the event of the purchase or redemption of all shares of the capital stock of the Corporation owned by the holder thereof, accrued Patronage Dividends for the relevant year or portion thereof (to be paid in the manner provided for payment of all Patronage Dividends), all without interest and subject to the Corporation's security interest, liens and rights of setoff. The stockholder owning the Redeemed Shares shall promptly remit to the Corporation any certificates representing the Redeemed Shares duly endorsed in blank or with stock powers.

(b) **PAYMENT OF REDEMPTION PRICE AND ISSUANCE OF SHARES UPON CONVERSION.** The Corporation shall pay the purchase price to the stockholder owning the Redeemed Shares or effect a conversion of the Redeemed Shares in the following manner:

(i) For a conversion of Class A Common Stock pursuant to Section 6(a), the Redeemed Shares shall be converted into shares of Class B Common Stock equal in number to the Class A Common Stock being converted and the Corporation shall issue such shares of Class B Common Stock to the holder of the Redeemed Shares.

(ii) For a redemption pursuant to Section 6(b):

10

(A) In the event that any of the Aggregate Put Purchase Price paid by TV Holdco is paid in cash, the Corporation shall pay cash to the stockholder in amount equal to the product of (x) $100, (y) the number of Purchased Put Shares purchased by the Corporation from such stockholder, and (z) the Cash Percentage, reduced by the amount of any setoff to which the Corporation may be entitled; and

(B) In the event any of the Aggregate Put Purchase Price paid by TV Holdco is paid by TV Holdco' issuance of a Put Option Note, the Corporation shall pay the remaining amount owed to the stockholder for its Redeemed Shares (i.e., after taking into account the amount paid in cash therefor pursuant to clause (A) above) only if and when it receives payment on the Put Option Note, with the Corporation making such payments pro rata among all Redeemed Shares with respect to which the Put Option Note was issued. If and to the extent interest is paid under the Put Option Note, the Corporation shall pay to the stockholder the amount of such interest attributable to the Redeemed Shares (net of any tax payable by the Corporation on account thereof). The Corporation's obligation to make such payment shall be subject to any security interest, lien or right of setoff to which the Corporation may be entitled and shall be subordinate to any indebtedness of the Corporation, whether existing, contingent or created after the incurrence by the Corporation of such payment obligation.

(C) Either the Corporation or TV Holdco may elect to have TV Holdco, immediately prior to the redemption of any Class B Units of TV Holdco in accordance with Section 3.9(d) of the TV Holdco LLC Agreement, (i) distribute a number of equity interests of one of TV Holdco's subsidiaries to the Corporation in exchange for the Class B Units to be redeemed, and, in such event, (ii) cause such subsidiary to immediately redeem such equity interests in cash (provided, that if TV Holdco would have been otherwise entitled to redeem the applicable Class B Units in exchange for a Put Option Note, then the Company may cause the issuance of a Put Option Note to the Corporation), in each case in accordance with Section 3.9(d) of the TV Holdco LLC Agreement in full satisfaction of TV Holdco's obligation to purchase such Class B Units pursuant to Section 3.9 of the TV Holdco LLC Agreement, and the provisions of Section 6(b) and this Section 7 shall apply to such redemption *mutatis mutandis*. Any such cash payments shall be subject to any security interest, lien or right of setoff to which the Corporation or any subsidiary of TV Holdco may be entitled.

(iii) For a conversion of Class A Common Stock pursuant to Section 6(c)(i), the Redeemed Shares shall be converted into shares of Class B Common Stock equal in number to the Class A Common Stock being converted and the Corporation shall issue such shares of Class B Common Stock to the holder of the Redeemed Shares.

(iv) For a redemption pursuant to Section 6(c)(ii), the Corporation shall pay cash equal to the par value of the Redeemed Shares, reduced by the amount of any setoff to which the Corporation may be entitled.

(c) AVAILABILITY OF FUNDS. Notwithstanding anything to the contrary expressed or implied herein, should the Board of Directors in its discretion determine that the funds of the Corporation available for such purpose are insufficient for immediate payment of all or any part of the redemption price in light of the Corporation's legal or business requirements, or that immediate payment of all or any part of the redemption price is otherwise not in the best interests of the Corporation, the Corporation may delay (without interest) the payment of all or any part of the redemption price until such time as the Board of Directors determines that sufficient funds are available for such purpose and that it is otherwise in the

11

Corporation's best interests to recommence payments for such purpose, at which time the Corporation shall pay to those entitled thereto, in the chronological order in which such payments were delayed starting with those whose payment has been longest delayed and continuing until sufficient funds are no longer available, or through another equitable manner determined by the Board of Directors, the unpaid redemption price in accordance with Section 7(b).

**SECTION 8. LIEN ON STOCK AND NOTES.** The Corporation shall have a security interest in, a lien on, and a right of setoff against, any stock or notes, including those issued as Patronage Dividend and against any cash portion of such Patronage Dividend which is in excess of twenty percent (20%) of the overall patronage dividend payable in any year for such indebtedness of the stockholder to the Corporation as may, for whatever cause, exist. In the event that the Corporation initiates proceedings to recover amounts due it by the stockholder, the Corporation shall be entitled to the recovery of all associated costs, interest and reasonable attorneys' fees.

## ARTICLE VIII
## MEMBER AGREEMENTS

**SECTION 1. CORPORATE PURPOSE.** The Corporation shall be organized and operated on a cooperative basis for the benefit of the holders of shares of its Class A Common Stock (who are its Members).

**SECTION 2. GENERAL TERMS.** As a condition of Membership every Member shall enter into a contract (the "Member Agreement") with this Corporation and every Member must be actively engaged in buying, selling and/or renting merchandise, supplies and/or services as are handled by retail hardware dealers and/or dealers in lumber and building supplies or dealers engaged in business as stated in Article II, Section 1 hereof, and must become and remain the owner of such number of shares of stock of the Corporation as shall be established from time to time by the Board of Directors. The Member Agreement shall contain such terms, conditions and agreements as the officers of this Corporation shall deem necessary or desirable or as shall be required hereunder, pursuant to the Certificate of Incorporation or these By-Laws, or pursuant to the direction of the Board of Directors. The Member Agreement shall not be assignable or transferable by the Member in any manner whatsoever, without the express written consent of the Corporation and shall contain, at a minimum, the following terms and provisions:

  (a) An express consent by the Member to the tax treatment and effects specified in Section 3 of Article IX hereof;

  (b) A requirement that the Member notify the Corporation in writing immediately upon any change in business name, form of organization (proprietorship, partnership, corporation), ownership or control;

  (c) A requirement that the Member purchase qualifying shares of the Corporation (as referred to in Article XII of these By-Laws) pursuant to a subscription agreement; and

  (d) Automatic modification of the Member Agreement upon notice by the Corporation to the Member of any relevant changes in the Certificate of Incorporation or By-Laws, or by approval of the Board of Directors.

**SECTION 3. TERMINATION.** Each Member Agreement may be terminated as provided therein.

**SECTION 4. CHANGE IN FORM OF BUSINESS.** In the event a Member changes a sole proprietorship, partnership or joint venture to a corporate form, where the Corporation has agreed to accept the corporate successor-in-interest as a Member, then the Member shall sell, transfer or otherwise assign to such successor-in-interest all shares of stock of this Corporation owned by such Member. Such shares shall remain subject to the Corporation's security interest, liens and right of setoff and all other rights provided for in the Certificate of Incorporation, By-Laws or Member Agreement.

\DC - 044951/000025 - 11668120 v6

**SECTION 5. MECHANICS OF SETOFF.** Notes issued by the Corporation, whether issued incidental to the distribution of a Patronage Dividend or to the redemption of Class B Common Stock, shall provide that if the Corporation exercises its right of setoff, the value of the note to be set off against the holder's indebtedness to the Corporation or one of its subsidiaries shall be determined at the time of setoff as follows: The Corporation shall have the right to discount the note to its then current cash value, which shall be in the lesser of the face amount of the note or the yield to maturity of the note as discounted at a rate per annum equal to the prime rate as reported in the Wall Street Journal on the day of setoff, plus two (2) percentage points.

**ARTICLE IX**
**PATRONAGE DIVIDENDS**

**SECTION 1. PAYMENT OF PATRONAGE DIVIDENDS.** Other than in connection with a dissolution, liquidation or winding-up of the Corporation, or a sale of all or substantially all of the assets of the Corporation (including through a merger), the Corporation shall distribute Patronage Dividends to Members annually on the basis of the volume of merchandise and/or services purchased by each Member with the Corporation or any of its subsidiaries, which equal the excess (if any) of gross margins and other income from business done with or for Members, after deducting therefrom the following:

      (a) Expenses directly or indirectly related to such business;

      (b) Such reasonable reserves for necessary corporate purposes as may from time to time be provided by the Board of Directors for depreciation and obsolescence, state and federal taxes, bad debts, casualty losses, insurance and other corporate and operating charges and expenses, all established and computed in accordance with generally accepted accounting principles;

      (c) Such reasonable reserves necessary for the operation of the Corporation and for deficits arising from such operation (including deficits from business other than business done with or for Members); and

      (d) Any amount of loss suffered by the Cooperative in any fiscal year, to the extent a loss exists after deducting such expenses, charges and reserves, allocated by the Cooperative on a reasonable basis among the Members.

Any amount set aside for reserves shall first be set aside from net earnings, if any, of the Corporation from business other than business done with or for Members, and only the excess shall be deducted from gross margins from business done with or for Members in the computation described above.

The amounts set aside for reserves in any year from gross margins of the Corporation from business done with or for Members shall be allocated, to the extent possible, to Members on the books of the Corporation on a patronage basis for that year, or, in lieu thereof, the books or records of the Corporation shall afford a means of doing so at any time, so that in the event of a distribution of amounts formerly carried in reserves each Member may receive, to the extent possible, Member's pro rata share thereof.

In the event of any dissolution, liquidation or winding up of the Corporation, or a sale of all or substantially all of the assets of the Corporation (including through a merger), after all debts and liabilities of the Corporation shall have been paid or reasonably reserved against, the remaining assets shall be distributed as follows: first, the par amounts of Class A Common Stock and Class B Common Stock, without preference or priority of one class over the other, shall be paid to the holders thereof in full (or pro rata to the extent of remaining assets if insufficient assets exist to make payment in full); and second, any amounts remaining shall be paid to the Members based upon each Member's patronage of the Corporation and any joint venture of the Corporation from which the Corporation receives patronage-sourced income over such period as may be determined to be equitable and practicable by the Board of Directors.

13

**SECTION 2. METHOD AND TIMING OF PAYMENT.** The Patronage Dividend to which Members become entitled for each fiscal year shall be distributed no later than the fifteenth day of the ninth month following such fiscal year. The Board of Directors may, in its discretion, determine to pay Patronage Dividends either all in a form that will be treated as a deductible qualified written notice of allocation within the meaning of section 1388(c) of the Internal Revenue Code of 1986, as amended (hereinafter referred to as the "IRC"), all in a form that will be treated as a nonqualified written notice of allocation within the meaning of section 1388(d) of the IRC, or part in qualified form and part in nonqualified form. At least twenty percent (20%) of any qualified payment of Patronage Dividends shall be paid in cash. Subject to this limitation with respect to qualified distributions, the Board of Directors may decide that the balance of any Patronage Dividend be paid, in whole or in part, in cash, property, Class B Common Stock, promissory notes or other evidences of indebtedness, or in any other form of written notice of allocation (within the meaning of section 1388(b) of the IRC).

**SECTION 3. TAX TREATMENT OF PATRONAGE DIVIDEND BY MEMBERS.** Each person who is a Member of the Corporation on the effective date of this section 3 of this Article IX of the By-Laws and continues as a Member after such date and each person who becomes a Member of the Corporation after such effective date shall, by such act alone, consent and be deemed to have consented that the amount of any distributions with respect to the Member's patronage which are made in written notices of allocation (as defined in section 1388 of the IRC) and which are received by the Member from the Corporation, will be taken into account by the Member at their stated dollar amounts in the manner provided in section 1385(a) of the IRC in the taxable year in which such written notices of allocation are received by the Member. This consent, however, shall not extend to written notices of allocation received by the Member as part of a nonqualified payment of patronage which clearly indicate on their face that they are nonqualified. By way of illustration, the term "written notice of allocation" shall include such items as the Promissory Notes (as defined in Section 5 of this Article IX), the shares of Class B Common Stock, a notice or statement that such securities have been deposited with a bank or other qualified agent on behalf of the Member, a notice of credit to the account of the Member on the books of the Corporation (against stock subscription or any other indebtedness as the Corporation may elect) and such other forms of notice as the Board of Directors may determine, distributed by the Corporation in payment, or part payment of the Patronage Dividends. The stated dollar amount of the Promissory Notes is the principal amount thereof and the stated dollar amount of the shares of Class B Common Stock is the par value thereof.

**SECTION 4. ISSUANCE OF CLASS B COMMON STOCK.** In order to ensure the Corporation's opportunity for healthy growth and expansion and in order to meet the corresponding needs for additional working capital, the following plan for the investment by Members of part of the Patronage Dividend shall, subject to modification or termination by the Board of Directors, be in effect:

> With respect to the Patronage Dividend payable for each fiscal year, the Corporation may pay each Member a portion of such Patronage Dividend in shares of Class B Common Stock of the Corporation at the par value thereof; provided, however, that at least twenty percent (20%) of such Member's Patronage Dividend shall be paid in money or by qualified check.

**SECTION 5. PROMISSORY NOTES.** Subject only to the payment of at least twenty percent (20%) of each Member's annual Patronage Dividend in cash and distribution of Class B Common Stock as provided in Section 4 of this Article IX, the Corporation may pay each Member all or any portion of the annual Patronage Dividend in promissory notes which shall bear interest at the rate from time to time fixed by the Board of Directors and shall mature at the time fixed by the Board of Directors not later than ten (10) years from the date of issuance, and are subordinated to any liabilities or obligations of the Corporation, existing, contingent or created after date of issuance ("Promissory Notes"). The Corporation shall have a security interest in, a lien upon and a right of setoff against any said Promissory Notes issued to a Member to secure payment of any indebtedness due the Corporation or any of its subsidiaries by the Member. Promissory Notes shall be subordinate to any indebtedness of the Corporation, whether existing, contingent or created after the date of issuance of the note.

14

SECTION 6. HARDSHIP. If, upon application by a Member, the Board of Directors shall determine that payment of such Member's Patronage Dividend for any year by the method herein provided or prescribed by the Board of Directors imposed an undue hardship upon such Member, the Board of Directors, in its discretion and with due regard for the financial condition and requirements of the Corporation, may authorize and cause the payment of all or any additional part of such Patronage Dividends in cash. The Board of Directors may implement this provision by adopting hardship guidelines and delegating authority to an officer or officers.

## ARTICLE X
## GENERAL PROVISIONS

SECTION 1. ANNUAL STATEMENT. The Board of Directors shall present at each annual meeting and when called for by vote of the holders of Class A Common Stock at any special meeting of the stockholders a full and clear statement of the business and conditions of the Corporation.

SECTION 2. CHECKS. All checks or demands for money and notes of the Corporation shall be signed by such officer or officers or as the Board of Directors may from time to time designate.

SECTION 3. FISCAL YEAR. The fiscal year of the Corporation shall commence each year on the Sunday following the Saturday that occurs closest to December 31 and shall terminate each year on the Saturday closest to December 31.

SECTION 4. DEFINITIONS. For all purposes of these By-Laws, (a) the term "TV Holdco" shall mean TV Holdco, L.L.C., a Delaware limited liability company, or any successor thereto, (b) the term "subsidiary" shall include (i) TV Holdco for so long as the Corporation owns an equity interest therein and (ii) [True Value, LLC] and its subsidiaries for so long as TV Holdco owns an equity interest therein, (c) the term "TV Holdco LLC Agreement" shall mean the Amended and Restated Limited Liability Company Agreement of TV Holdco, as may be amended from time to time in accordance with the terms thereof and (d) the term "Certificate of Incorporation" shall mean the Amended and Restated Certificate of Incorporation of the Corporation, as may be further amended and/or restated from time to time in accordance with the terms thereof and the DGCL.

## ARTICLE XI
## BY-LAW AMENDMENTS

SECTION 1. BY-LAW AMENDMENTS. These By-Laws may be altered or repealed at any annual meeting of the stockholders or at any special meeting of the stockholders at which a quorum is present or represented, provided notice of the proposed alteration or repeal be contained in the notice of such special meeting, or by the affirmative vote of two-thirds of the Board of Directors then in office at any regular meeting of the Board of Directors or at any special meeting of the Board of Directors if the notice of the proposed alteration or repeal be contained in the notice of such special meeting; provided however, that no change of time or place of the meeting for the election of directors shall be made within sixty (60) days before the day on which such meeting is to be held, and that, in case of any change of such time or place, notice thereof shall be given to each stockholder in person, by any electronic communication, or by letter mailed to the stockholder's last known post office address at least twenty (20) days before the meeting is held.

## ARTICLE XII
## QUALIFYING SHARES OF CAPITAL STOCK

SECTION 1. QUALIFYING SHARES. The unit ownership of Class A Common Stock shall consist of one (1) share and no person shall be deemed to be a member of the Corporation or shall exercise any of the rights of a member unless such person is the holder of record of one (1) fully paid and nonassessable share of said Class A Common Stock, $100 par value, for each store owned, up to a maximum of

15

eighteen (18) shares of said Class A Common Stock for each store owned, or a maximum of ninety (90) total shares of Class A Common Stock, representing five (5) or more stores.

## ARTICLE XIII
## INDEMNIFICATION OF OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS

**SECTION 1. RIGHT TO INDEMNIFICATION.** Each person who was or is a party or is threatened to be made a party to or is involved (as a party, witness, or otherwise), in any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative (hereinafter a "Proceeding"), by reason of the fact that he or she, or a person of/for whom he or she is the legal representative, is or was a director, officer, employee or agent of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of the Corporation or of a partnership, joint venture, trust, or other enterprise, including service with respect to employee benefit plans, whether the basis of the Proceeding is alleged action in an official capacity as a director, officer, employee or agent in any other capacity while serving as a director, officer, employee or agent (hereafter an "Indemnitee"), shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the Delaware General Corporation Law, as the same exists or may hereafter be amended or interpreted (but, in the case of any such amendment or interpretation, only to the extent that such amendment or interpretation permits the Corporation to provide broader indemnification rights than were permitted prior thereto) against all expenses, liability, and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties, and amounts paid or to be paid in settlement, and any interest, assessments, or other charges imposed thereon, and any federal, state, local, or foreign taxes imposed on any Indemnitee as a result of the actual or deemed receipt of any payments under this Article) reasonably incurred or suffered by such person in connection with investigating, defending, being a witness in, or participating in (including on appeal), or preparing for any of the foregoing in, any Proceeding (hereinafter "Expenses"); provided, however, that except as to actions to enforce indemnification rights pursuant to section 3 of this Article, the Corporation shall indemnify any Indemnitee seeking indemnification in connection with a Proceeding (or part thereof) initiated by such person only if the Proceeding (or part thereof) was authorized by the Board of Directors of the Corporation. The right to indemnification conferred in this Article shall be a contract right for officers and directors.

**SECTION 2. AUTHORITY TO ADVANCE EXPENSES.** Expenses incurred by an officer or director (acting in his or her capacity as such) in defending a Proceeding shall be paid by the Corporation in advance of the final disposition of such Proceeding, provided, however, that if required by law such Expenses shall be advanced only upon delivery to the Corporation of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the Corporation as authorized in this Article or otherwise. Expenses incurred by other indemnitees of the Corporation (or by the directors or officers not acting in their capacity as such, including service with respect to employee benefit plans) may be advanced upon such terms and conditions as the Board of Directors deems appropriate. Any advancement is not intended to be a loan and any obligation to reimburse the Corporation for Expense advances shall be unsecured and no interest shall be charged thereon.

**SECTION 3. RIGHT OF CLAIMANT TO BRING SUIT.** If a claim under section 1 or 2 of this Article is not paid in full by the Corporation within a reasonable period of time after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall be entitled to be paid also the expense (including attorneys' fees) of prosecuting such claim. It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending a Proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has not met the standards of conduct that make it permissible under the Delaware General Corporation Law for the Corporation to indemnify the claimant for the amount claimed. The burden of proving such a defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors or committees thereof, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper under the circumstances because he or she has met the applicable standard of conduct set

16

forth in the Delaware General Corporation Law, nor an actual determination by the Corporation (including its Board of Directors or committees thereof, independent legal counsel, or its stockholders) that the claimant had not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct.

**SECTION 4. PROVISIONS NONEXCLUSIVE.** The rights conferred on any person by this Article shall not be exclusive of any other rights that such person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, agreement, vote of stockholders or disinterested directors, or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office. To the extent that any provision of the Certificate of Incorporation, agreement, or vote of the stockholders or disinterested directors is inconsistent with these By-Laws, the provision, agreement, or vote shall take precedence.

**SECTION 5. AUTHORITY TO INSURE.** The Corporation may purchase and maintain insurance to protect itself and any Indemnitee against any Expense, whether or not the Corporation would have the power to indemnify against such Expense under applicable law or the provisions of this Article.

**SECTION 6. FORM OF INDEMNIFICATION.** The Corporation may fulfill its indemnification obligations by, at its election, paying Expenses and obligations directly, assuming the defense of any Proceeding, hiring counsel reasonably acceptable to the Indemnitee, reimbursing Indemnitee for amounts paid by Indemnitee or in any other manner determined by the Board of Directors.

**SECTION 7. SURVIVAL OF RIGHTS.** The rights provided by this Article shall continue as to a person who has ceased to be an Indemnitee and shall inure to the benefit of the heirs, executors, and administrators of such a person.

**SECTION 8. SETTLEMENT OF CLAIMS.** The Corporation shall not be liable to indemnify any Indemnitee under this Article (a) for any amounts paid in settlement of any action or claim effected without the Corporation's written consent, which consent shall not be unreasonably withheld; or (b) for any judicial award if the Corporation was not given a reasonable and timely opportunity, at its expense, to participate in the defense of such action.

**SECTION 9. EFFECT OF AMENDMENT.** Any amendment, repeal, or modification of this Article shall not adversely affect any right or protection of any Indemnitee existing at the time of such amendment, repeal, or modification.

**SECTION 10. SUBROGATION.** In the event of payment under this Article, the Corporation shall be subrogated to the extent of such payment to all of the rights of recovery of the Indemnitee, who shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Corporation effectively to bring suit to enforce such rights.

**SECTION 11. NO DUPLICATION OF PAYMENTS.** The Corporation shall not be liable under this Article to make any payment in connection with any claim made against the Indemnitee to the extent the Indemnitee has otherwise actually received payment (under any insurance policy, agreement, vote, or otherwise) of the amounts otherwise indemnifiable hereunder.

WDC - 044951/000025 - 11668120 v6

True Value Company   Store #19540 TRUE VALUE

**Statement Date: 7/16/2019**                           **Statement Due: 7/25/2019**

New Activity

| | Checks Received | | Total Amount | | Credit Review Point |
|---|---|---|---|---|---|
| | 0 | | 0.00 | | 0.00 |
| Gross Invoice | | DS Adder | | Early Pay/Discount | Grand Total |
| 378,843.19 | | 0.00 | | 0.00 | 378,843.19 |
| Current | | Futures | | Early Pay/Discount | Grand Total |
| 378,843.19 | | 0.00 | | 0.00 | 378,843.19 |

Statement Category Totals

| Past Due | Current Due | Total Due Now | Future Due | Unapplied Cash | Statement Total |
|---|---|---|---|---|---|
| 3,195.88 | 378,843.19 | 382,039.07 | 0.00 | 0.00 | 382,039.07 |

Future Due Summary

| Month Due | Amount | Early Pay/Disc Avail. | Not Future Due |
|---|---|---|---|
| JULY 2019 | 0.00 | 0.00 | 0.00 |
| AUGUST 2019 | 0.00 | 0.00 | 0.00 |
| SEPTEMBER 2019 | 0.00 | 0.00 | 0.00 |
| OCTOBER 2019 | 0.00 | 0.00 | 0.00 |
| NOVEMBER 2019 | 0.00 | 0.00 | 0.00 |
| DECEMBER 2019 | 0.00 | 0.00 | 0.00 |
| JANUARY 2020 | 0.00 | 0.00 | 0.00 |
| FEBRUARY 2020 | 0.00 | 0.00 | 0.00 |
| MARCH 2020 | 0.00 | 0.00 | 0.00 |
| APRIL 2020 | 0.00 | 0.00 | 0.00 |
| MAY 2020 | 0.00 | 0.00 | 0.00 |
| JUNE 2020 | 0.00 | 0.00 | 0.00 |
| OVER ONE YEAR | 0.00 | 0.00 | 0.00 |
| **TOTAL** | **$ 0.00** | **$ 0.00** | **$ 0.00** |

Save As PDF



## Past Due Items

| | Cust | Code | Post Date | Due Date | Description | Invoice Number | Purchase Order | Gross Invoice | DS Adder | SubTotal | Early Pay Disc | DS Disc | Amount Owing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 19540 | KL | 3/11/2019 | 3/25/2019 | MARKETING BILLING | OM0033901567 | MARKETING BI | 96.05 | 0.00 | 96.05 | 0.00 | 0.00 | 96.05 |
| 2 | 19540 | MNPR | 3/14/2019 | 3/25/2019 | MIN SUPPORT CHARGE 1 | 031400000430_04 | MIN SUPPORT | 100.00 | 0.00 | 100.00 | 0.00 | 0.00 | 100.00 |
| 3 | 19540 | RSBF | 3/15/2019 | 3/25/2019 | BRAND FEE | 031500001949_04 | BRAND FEE | 150.00 | 0.00 | 150.00 | 0.00 | 0.00 | 150.00 |
| 4 | 19540 | RSRS | 3/15/2019 | 3/25/2019 | ROCKSOLID SOFTW SUPP | 031500004735_02 | ROCKSOLID SO | 236.25 | 0.00 | 236.25 | 0.00 | 0.00 | 236.25 |
| 5 | 19540 | RTCM | 3/1/2019 | 3/25/2019 | ELEC COMM CHARGE | 030100002706_04 | ELEC COMM | 49.84 | 0.00 | 49.84 | 0.00 | 0.00 | 49.84 |
| 6 | 19540 | FTAX | 3/30/2019 | 4/10/2019 | MAR 2019 TAX SUM | 03301638_03 | | 0.70 | 0.00 | 0.70 | 0.00 | 0.00 | 0.70 |
| 7 | 19540 | MNPR | 3/27/2019 | 4/10/2019 | MIN SUPPORT CHARGE 2 | 032700001586_05 | MIN SUPPORT | 100.00 | 0.00 | 100.00 | 0.00 | 0.00 | 100.00 |
| 8 | 19540 | MW04 | 3/22/2019 | 4/10/2019 | WHSE INVOICE | 0319151904_01 | RKR82 | 25.70 | 0.00 | 25.70 | 0.00 | 0.00 | 25.70 |
| 9 | 19540 | RSRP | 3/26/2019 | 4/10/2019 | RPS CHARGE - MAR | 03301377_05 | RPS CHARGE | 50.00 | 0.00 | 50.00 | 0.00 | 0.00 | 50.00 |
| 10 | 19540 | MNPR | 4/14/2019 | 4/25/2019 | MIN SUPPORT CHARGE 1 | 041400000424_04 | MIN SUPPORT | 100.00 | 0.00 | 100.00 | 0.00 | 0.00 | 100.00 |
| 11 | 19540 | RSBF | 4/15/2019 | 4/25/2019 | BRAND FEE | 041500001933_04 | BRAND FEE | 150.00 | 0.00 | 150.00 | 0.00 | 0.00 | 150.00 |
| 12 | 19540 | RSRS | 4/15/2019 | 4/25/2019 | ROCKSOLID SOFTW SUPP | 041500004696_04 | ROCKSOLID SO | 236.25 | 0.00 | 236.25 | 0.00 | 0.00 | 236.25 |
| 13 | 19540 | RTCM | 4/1/2019 | 4/25/2019 | ELEC. COMM CHARGE | 040100002691_04 | ELEC COMM | 50.00 | 0.00 | 50.00 | 0.00 | 0.00 | 50.00 |
| 14 | 19540 | KL | 4/29/2019 | 5/10/2019 | MARKETING BILLING | OM9040001410 | MARKETING BI | 95.48 | 0.00 | 95.48 | 0.00 | 0.00 | 95.48 |
| 15 | 19540 | MNPR | 4/28/2019 | 5/10/2019 | MIN SUPPORT CHARGE 2 | 042800001573 | MIN SUPPORT | 100.00 | 0.00 | 100.00 | 0.00 | 0.00 | 100.00 |
| 16 | 19540 | RSRP | 4/23/2019 | 5/10/2019 | RPS CHARGE - APR | 04301381_05 | RPS CHARGE | 50.00 | 0.00 | 50.00 | 0.00 | 0.00 | 50.00 |
| 17 | 19540 | KL | 5/10/2019 | 5/25/2019 | MARKETING BILLING | OM9050001388 | MARKETING BI | 95.36 | 0.00 | 95.36 | 0.00 | 0.00 | 95.36 |
| 18 | 19540 | MNPR | 5/14/2019 | 5/25/2019 | MIN SUPPORT CHARGE 1 | 051400000418_04 | MIN SUPPORT | 100.00 | 0.00 | 100.00 | 0.00 | 0.00 | 100.00 |
| 19 | 19540 | RSBF | 5/15/2019 | 5/25/2019 | BRAND FEE | 051500001906_05 | BRAND FEE | 150.00 | 0.00 | 150.00 | 0.00 | 0.00 | 150.00 |
| 20 | 19540 | RSRS | 5/15/2019 | 5/25/2019 | ROCKSOLID SOFTW SUPP | 051500004668_04 | ROCKSOLID SO | 236.25 | 0.00 | 236.25 | 0.00 | 0.00 | 236.25 |
| 21 | 19540 | RTCM | 5/1/2019 | 5/25/2019 | ELEC. COMM CHARGE | 050100002686_04 | ELEC COMM | 10.69 | 0.00 | 10.69 | 0.00 | 0.00 | 10.69 |
| 22 | 19540 | FCSC | 5/16/2019 | 5/10/2019 | SERVICE CHARGE | 20190516_386 | | 10.69 | 0.00 | 10.69 | 0.00 | 0.00 | 10.69 |
| 23 | 19540 | MNPR | 5/27/2019 | 6/10/2019 | MIN SUPPORT CHARGE 2 | 052700001562_03 | MIN SUPPORT | 100.00 | 0.00 | 100.00 | 0.00 | 0.00 | 100.00 |
| 24 | 19540 | RSRP | 5/21/2019 | 6/10/2019 | RPS CHARGE - MAY | 05301349_06 | RPS CHARGE | 50.00 | 0.00 | 50.00 | 0.00 | 0.00 | 50.00 |
| 25 | 19540 | FCSC | 6/1/2019 | 6/25/2019 | SERVICE CHARGE | 20190601_386 | | 14.71 | 0.00 | 14.71 | 0.00 | 0.00 | 14.71 |
| 26 | 19540 | KL | 6/13/2019 | 6/25/2019 | MARKETING BILLING | OM9060001365 | MARKETING BI | 95.44 | 0.00 | 95.44 | 0.00 | 0.00 | 95.44 |
| 27 | 19540 | MNPR | 6/14/2019 | 6/25/2019 | MIN SUPPORT CHARGE 1 | 061400000414_04 | MIN SUPPORT | 100.00 | 0.00 | 100.00 | 0.00 | 0.00 | 100.00 |
| 28 | 19540 | RTCM | 6/2/2019 | 6/25/2019 | ELEC. COMM CHARGE | 060200002846_01 | ELEC COMM | 50.00 | 0.00 | 50.00 | 0.00 | 0.00 | 50.00 |
| 29 | 19540 | FCSC | 6/16/2019 | 7/10/2019 | SERVICE CHARGE | 20190616_402 | | 16.91 | 0.00 | 16.91 | 0.00 | 0.00 | 16.91 |
| 30 | 19540 | MNPR | 6/27/2019 | 7/10/2019 | MIN SUPPORT CHARGE 2 | 062700001550_04 | MIN SUPPORT | 100.00 | 0.00 | 100.00 | 0.00 | 0.00 | 100.00 |
| 31 | 19540 | RSBF | 6/18/2019 | 7/10/2019 | BRAND FEE | 061800001893_01 | BRAND FEE | 150.00 | 0.00 | 150.00 | 0.00 | 0.00 | 150.00 |
| 32 | 19540 | RSRS | 6/15/2019 | 7/10/2019 | ROCKSOLID SOFTW SUPP | 061500004658_01 | ROCKSOLID SO | 236.25 | 0.00 | 236.25 | 0.00 | 0.00 | 236.25 |
| 33 | 19540 | RSRP | 6/25/2019 | 7/10/2019 | RPS CHARGE - JUN | 06301336_05 | RPS CHARGE | 50.00 | 0.00 | 50.00 | 0.00 | 0.00 | 50.00 |
| | | | | | | | PAST DUE SUBTOTALS | 3,195.88 | 0.00 | 3,195.88 | 0.00 | 0.00 | 3,195.88 |

Current Due Items

| | Cust | Code | Post Date | Due Date | Description | Invoice Number | Purchase Order | Gross Invoice | DS Adder | SubTotal | Early Pay Disc | DS Disc | Amount Owing | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 19540 | FCSC | 7/1/2019 | 7/25/2019 | * SERVICE CHARGE | 20190701_419 | | 18.30 | 0.00 | 18.30 | 0.00 | 0.00 | 18.30 | ☐ |
| 2 | 19540 | KL | 7/11/2019 | 7/25/2019 | * MARKETING BILLING | DM9070901029 | MARKETING BI | 75.93 | 0.00 | 75.93 | 0.00 | 0.00 | 75.93 | ☐ |
| 3 | 19540 | RS | 7/11/2019 | 7/25/2019 | * Loan Termination | 1235295 | LOAN TERMINA | 146,804.60 | 0.00 | 146,804.60 | 0.00 | 0.00 | 146,804.60 | ☐ |
| 4 | 19540 | RS | 7/15/2019 | 7/25/2019 | * Mbr Assistance Repay | 1236701 | MBR ASSISTAN | 223,144.36 | 0.00 | 223,144.36 | 0.00 | 0.00 | 223,144.36 | ☐ |
| 5 | 19540 | RS | 7/15/2019 | 7/25/2019 | * Mbr Assistance Repay | 1236703 | MBR ASSISTAN | 8,750.00 | 0.00 | 8,750.00 | 0.00 | 0.00 | 8,750.00 | ☐ |
| 6 | 19540 | RTCM | 7/1/2019 | 7/25/2019 | * ELEC. COMM CHARGE | 070100002624_04 | ELEC COMM | 50.00 | 0.00 | 50.00 | 0.00 | 0.00 | 50.00 | ☐ |
| | | | | | | CURRENT DUE SUBTOTALS | | 378,843.19 | 0.00 | 378,843.19 | 0.00 | 0.00 | 378,843.19 | |

Future Due Items

| Cust | Code | Post Date | Due Date | Description | Invoice Number | Purchase Order | Gross Invoice | DS Adder | SubTotal | Early Pay Disc. | DS Disc. | Amount Owing |
|------|------|-----------|----------|-------------|----------------|----------------|---------------|----------|----------|-----------------|----------|--------------|
|      |      |           |          | -- No Future Due Items Available In This Statement -- | | | | | | | | |
|      |      |           |          | FUTURE DUE SUBTOTALS | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

## My Calculator

| | |
|---|---|
| Past Due Items | $ .00 |
| Current Items | $ .00 |
| Future Due Items | $ .00 |
| SubTotal | $ .00 |
| Early Pay Disc | $ .00 |
| DS Disc. | $ .00 |
| Grand Total | $ .00 |

### Send Payment To

PO BOX 3316

BOSTON MA 02241-3316

### Selection Shortcuts

☐ Select All Past Due Items
☐ Select All Current Due Items
☑ Select All Future Due Items

### View/Print EFT Enrollment Agreement

Click the link below to View and Print your
Member Statement EFT Enrollment Agreement

EFT Enrollment Agreement

### Past Due Statement Total

| | |
|---|---|
| Gross Amount | $ 3,195.88 |
| DS Adder | $ .00 |
| SubTotal | $ 3,195.88 |
| Early Pay Disc. | $ .00 |
| DS Disc. | $ .00 |
| Amount Due | $ 3,195.88 |
| Amount Paid | $ .00 |
| Total Due | $ 3,195.88 |

### Current Due Statement Total

| | |
|---|---|
| Gross Amount | $ 376,843.19 |
| DS Adder | $ .00 |
| SubTotal | $ 376,843.19 |
| Early Pay Disc. | $ .00 |
| DS Disc. | $ .00 |
| Amount Due | $ 376,843.19 |
| Amount Paid | $ .00 |
| Total Due | $ 376,843.19 |

### Future Due Statement Total

| | |
|---|---|
| Gross Amount | $ .00 |
| DS Adder | $ .00 |
| SubTotal | $ .00 |
| Early Pay Disc. | $ .00 |
| DS Disc. | $ .00 |
| Amount Due | $ .00 |
| Amount Paid | $ .00 |
| Total Due | $ .00 |

### Unapplied Cash Statement Total

| | |
|---|---|
| Total Amount | $ .00 |

Codes Used on this Statement:

| Position 1: | M - Merchandise | F - Finance | K - Advertising | R - Retail Operations |
| Position 2: | W - Warehouse | B - Bankcards | A - Advertising | S - Services |
| | R - Relay | C - Credit Services | L - Circular | C - Catalog |
| | D - Direct | T - Tax | | T - Retail Systems |
| | L - Lumber | R - Retail Accounting | | R - Rental |
| | T - TruServ Mfg | A - T.S.A.C. | | I - Industrial |
| | | M - Member Investment | | G - Garden |

Symbols
* New Activity
[ X ] Item has been selected for payment
[   ] Item has not been selected for payment.

Remit Payment To:

PO BOX 3316

BOSTON MA 02241-3316



7058 Snowdrift Road
Allentown, PA 18106

June 25, 2019

Mr. Jose Zambrano, President
International Hardware Supplies, LLC
DBA True Value #19540
2555 North Hiatus Road
Cooper City, FL 33026

Dear Mr. Zambrano:

As of June 25, 2019, your obligation to True Value Company, L.L.C. ("Company") and TV Cooperative Company ("Cooperative") (collectively, "True Value") shows a total amount due of $3,045.88, most of which is delinquent. This is not necessarily a final balance as other debits and/or credits may be processed. All available privileges of offset will be implemented, and your credit limit reduced to zero at this time. We remind you that failure to pay your obligations by their due date constitutes a breach of obligation under your Member Agreement with True Value. We hereby make final demand upon you for payment in full.

Please be advised that if payment by certified check or Electronic Funds Transfer for $3,045.88 is not posted to your account by the close of business on the 10th day following the date of receipt of this notice, or other payment arrangements acceptable to True Value are not made, your Membership in True Value will be subject to termination for breach of Membership obligations, and it will be necessary to refer this matter to our legal staff for review and appropriate action.

In the event of termination, the redemption or conversion of your Class A and Class B Common Stock will take place pursuant to the terms listed in Sections 6(a) and 7 of Article VII of the Amended and Restated By-Laws. Specifically, all rights and privileges incident to the ownership of your shares shall cease, including the Stockholder Put Right. The Cooperative will redeem your Class A Shares by converting them into an equal number of Class B Shares. Your Class B Shares will remain outstanding until a liquidity event such as a merger, sale or IPO occurs in accordance with the terms of the Acquisition Agreement. Additionally, you will not be eligible for either of the Volume or Growth Rebates for this current year, or for any unpaid Rebates from prior years. Your member statement, together with all outstanding invoices and any other financial obligations to the Company, shall become immediately due and payable in full upon termination. You should note that there is no right of offset against your Class B Shares.

Please avoid the consequences of termination and/or the time and expense involved in legal action by promptly remitting full payment as requested. If you have any questions concerning this matter, please do not hesitate to call me at 1-800-220-4207. I look forward to your prompt remittance.

Sincerely,

Pamela Paul-Kane
Retail Finance Manager
Allentown Credit Services

cc:     John Hammerle, Esq.
        Tim Mills
        Michael Block
        Timothy Hanna
        David Brockman

ORIGINAL SENT FEDERAL EXPRESS OVERNIGHT MAIL / COPY SENT FIRST CLASS MAIL

*True Value.*





FedEx Express Package US Airbill

1 From
Sender's Name: Mark Dearth
Company: TRUE VALUE COMPANY
Address: 7058 SNOWDRIFT RD
City: ALLENTOWN  State: PA  ZIP: 18106-9274

2 Your Internal Billing Reference

3 To
Recipient's Name: Jose Zambrano
Company: International Hand Supplies LLC
Address: 2555 North Health Value #15540
City: Cooper City  State: FL  ZIP: 33026

4 Express Package Service

5 Packaging

6 Special Handling and Delivery Signature Options

7 Payment Bill to

PULL AND RETAIN THIS COPY BEFORE AFFIXING TO THE PACKAGE. NO POUCH NEEDED.

8146 8746 8986

4313-6968-1

0215  MUR3

01335029443

611

Returned Unasssired

Ship it. Track it. Pay for it. All online.
fedex.com

fedex.com 1.800.GoFedEx 1.800.463.3339

## PERSONAL GUARANTY

True Value Company
8600 W. Bryn Mawr Avenue
Chicago, Illinois 60631

For and in consideration of True Value Company's ("Company") agreement to sell goods, wares, inventory and merchandise and furnish services upon credit or consignment or to provide financial assistance to:

| | |
|---|---|
| Firm Name | International Hardware Supplies, LLC |
| d/b/a | True Value of Broward |
| Address | 2555 N Hiatus Road |

| | | | |
|---|---|---|---|
| Cooper City | FL | 33026-1301 | BROWARD |
| City | State/Province | Postal Zip | Country |

(hereafter referred to as "Debtor") or any of Debtor's parent company, subsidiaries, affiliates, divisions, or joint ventures or any of their successors or assigns, in existence on or after the date of this Personal Guaranty (collectively "Debtors"), or the extension of time for any credit heretofore or hereafter given to one or more Debtors due to the existence of a Retail Member Agreement with the Company and any amendment thereto, at any current or hereafter established location(s) (including, but not limited to, multiple locations that may be opened after the date hereof) and under any d/b/a name, the undersigned hereby guarantees absolutely and unconditionally, at all times, the payment unto you of any and all amounts owed for goods, wares, inventory, merchandise and services, amounts due under any installment notes, and any other past, present or future indebtedness due from any one or more Debtors.

The undersigned has a direct or indirect equity or other interest in one or more of the Debtors by way of the undersigned being a shareholder, owner, principal or otherwise and, therefore, acknowledge that the undersigned will receive a benefit from the credit extended to Debtors and from the execution of this guaranty.

The undersigned hereby waives notice of acceptance of this guaranty, and all notice of the goods, wares, inventory and merchandise and services sold or furnished by Company to said Debtors and all notice of defaults by said Debtors, and the undersigned consents to any extension or extensions of time or times of payment of said indebtedness, or any portion thereof, and to any change in form, or renewal at any time, of such indebtedness, or any part thereof, or to any evidence thereof taken at any time by you. The undersigned waives any defenses, claims and discharges of the Debtors pertaining to Debtors indebtedness to you, except the defense of discharge by payment in full.

This is a continuing, absolute and unconditional guaranty, and it shall remain in full force and effect until all of Debtors indebtedness to you is paid in full. The extension of the time of payment or the acceptance of any sum or sums on account, or the acceptance of notes, drafts or any security from said Debtors or the acceptance, alteration or release of any security or any other guaranty whether provided by one or more Debtors or any other person, shall in no way impair the validity of this guaranty or affect or impair the liability of the undersigned under this guaranty. Should any purchase heretofore or hereafter made by the said Debtors, from you, be not paid when due, as determined by you, you shall have the right to proceed against the undersigned therefore at any time, without any notice whatsoever and without any proceeding or action against any of the Debtors (or any other guarantor or any other security), and the undersigned hereby waive any demand whatsoever for payment.

If any payment received by you in respect of any indebtedness of Debtors is thereafter set aside, reversed, rescinded or required to be returned for any reason (including without limitation the bankruptcy, insolvency or reorganization of one or more of the Debtors), such indebtedness shall for the purposes of this guaranty be deemed to have continued in existence, notwithstanding such receipt, and this guaranty shall be enforceable as to such indebtedness as if such payment had never been received.

The guaranty shall not be revoked by the death of any of the undersigned but shall remain in full force and effect against the executor or administrator of the deceased guarantor (and against the other undersigned, if there is more than one) and may only be revoked upon thirty (30) days' written notice by any of the undersigned or its executor or administrator. Such revocation shall not affect the liability of such undersigned for any indebtedness which has been incurred up to the time of your actual receipt of notice of revocation by your President at the address above.

This guaranty shall not be abrogated or affected in any manner by the change in the composition of any of the Debtors, whether caused by the change of any of the Debtors membership in you, by sale or transfer of Debtors store(s) or by the change of the corporate or other legal structure of any of the Debtor.

Should any of the Debtors at any time become liquidated or insolvent (howsoever evidenced) or should bankruptcy or insolvency proceedings be instituted against any of the Debtors or any of the undersigned, then and in that event, you shall have the right, at your option, without demand or notice whatsoever, to proceed as you see fit against the undersigned for the full amount due you from the Debtors. You shall have the further right at your option to prove and file your entire claim against the Debtors, and to collect any dividends that may be realized on your claims. If you realize or receive any dividends in any liquidation proceeding in any amounts in excess of the amount due from the Debtors or the undersigned by reason of this guaranty, you shall be obligated to remit to the undersigned any surplus to the extent that the undersigned is entitled.

Page 1

Rev 04-01-2014



PG-TV-01 01-09

It is the intention of this guaranty to assure you of payment, in full, for any indebtedness from time to time due from any of the Debtors (whether now or hereafter existing).

The undersigned agree that you shall have the sole discretion to determine to which obligation or in what order any payment, security or credit shall be applied, all to the end that you shall have maximum assurance of payment of all obligations to you.

Should you employ an attorney or attorneys to enforce the payment or other terms of this guaranty, or to enforce the payment of any claim or claims against any of the Debtors, you shall be entitled to reimbursement from the undersigned of the amount of attorneys' fees and other costs which you may have paid or obligated yourself to pay.

The undersigned agree that any amounts due from the undersigned shall be due upon demand and shall be paid to you at 8600 W. Bryn Mawr Avenue, Chicago, Illinois 60631-3505.

The failure of you to enforce any of the provisions of this guaranty at any time or for any period of time shall not be construed to be a waiver of any such provision or of the right thereafter to enforce the same.

**This instrument contains the entire and only agreement between the undersigned and you with respect to the guaranty of debts and obligations of the Debtors by the undersigned and any representation, promise, condition or undertaking in connection therewith which is not expressed in this guaranty shall not be binding on you or upon the undersigned. All prior collateral understandings and agreements concerning such guaranty having been superseded by this guaranty. The provisions of this guaranty shall not be changed or discharged except by written instrument signed by you and the undersigned and may be revoked only in accordance with this provision. The signing of this guaranty by the undersigned does not change or discharge any guaranty previously signed relating to Debtors. Likewise, the signing of any additional guaranty of any of the Debtors does not change or discharge this guaranty.**

This guaranty shall be governed by and only interpreted according to the laws of Illinois (without regard to principles of conflicts of law). The undersigned consent to the exclusive personal jurisdiction and venue of any federal or state court in Cook County or any Illinois county contiguous to Cook County, Illinois regarding any dispute involving this guaranty. The invalidity or unenforceability of any provision of this guaranty shall not affect any other provision. If any provision of this guaranty is determined by a court of competent jurisdiction to be invalid or unenforceable, that provision shall be deemed severable and this guaranty shall be enforced with that provision severed or as modified by the court.

If there is more than one undersigned, the obligations hereunder are joint and several with respect to each undersigned.

The undersigned personal guarantor, recognizing that his or her individual credit history may be a necessary factor in the evaluation of this personal guarantee, hereby consents to and authorizes the use of a consumer credit report on the undersigned, by the above named business credit grantor, from time to time as may be needed, in the credit evaluation process.

| | |
|---|---|
| _Jose L. Zambrano_ | |
| (Signature of Guarantor) | (Signature of Second Guarantor if more than one) |
| Jose Zambrano | Jose Zambrano |
| (Printed Name) | (Printed Name) |
| 9661 W 35th Ct | 9661 W 35th Ct. |
| (Street Address) | (Street Address) |
| | |
| (2nd Address Line) | (2nd Address Line) |
| Hialeah, FL 33018 | Hialeah, FL 33018 |
| (City)   (State / Province)   (Postal / Zip)   (Country) | (City)   (State / Province)   (Postal / Zip)   (Country) |
| | |
| (Social Security Number) | (Social Security Number) |
| 12/13/2017 | 12/13/2017 |
| (Date) | (Date) |

**IMPORTANT**
A signed Financial Statement of each guarantor may be required of each Guarantor and if so, must accompany this form when returned to True Value Company. Signed Financial Statements may be required yearly thereafter.

Page 2

Rev 04-01-2014

PG-TV-01-01-08



7058 Snowdrift Road
Allentown, PA 18106

June 25, 2019

Mr. Jose Zambrano
9661 W. 35th Court
Hialeah, FL 33018

Dear Mr. Zambrano:

As of June 25, 2019, the obligation of #19540 International Hardware Supplies, LLC, dba True Value to True Value Company, L.L.C. ("Company") and/or TV Cooperative Company ("Cooperative") (collectively, "True Value") shows a total amount due of $3,045.88, most of which is delinquent. This is not necessarily a final balance as other debits and/or credits may be processed. As personal guarantor of the debts of #19540 International Hardware Supplies, LLC, dba True Value, we hereby make final demand upon you for payment in full due to the delinquent status of the account.

Please be advised that if payment by certified check or Electronic Funds Transfer for $3,045.88 is not posted to the account of #19540 International Hardware Supplies, LLC, dba True Value, by the close of business on the 10th day following the date of receipt of this notice, or other payment arrangements acceptable to True Value are not made, it will be necessary to refer this matter to our legal staff for review and appropriate action.

Please avoid the time and expense involved in legal action by promptly remitting full payment as requested. If you have any questions concerning this matter, please do not hesitate to call me at 1-800-220-4207. I look forward to your prompt remittance.

Sincerely:

Pamela Fauri Haire
Retail Finance Manager
Allentown Credit Services

cc:    John Hammerle, Esq.
       Tim Mills
       Michael Block
       Timothy Hanna
       David Brockman

ORIGINAL SENT FEDERAL EXPRESS OVERNIGHT MAIL / COPY SENT FIRST CLASS MAIL



PULL AND RETAIN THIS COPY BEFORE AFFIXING TO THE PACKAGE. NO POUCH NEEDED.

**FedEx Express Package US Airbill**

Fed Tracking Number 8146 8746 9000

From 0215

1 From Please print and press hard.
Date 6/25/09
Sender's FedEx Account Number
Sender's Name MARK DECHOWA Phone 630 220 4209
Company TRUE VALUE COMPANY
Address 7058 SNOWDRIFT RD
City ALLENTOWN State PA ZIP 18106-9274

2 Your Internal Billing Reference

3 To
Recipient's Name JOSC ZAMBRANA Phone
Company
Address 9611 W 35TH CONE
Hold Weekday
Hold Saturday
City HIALEAH State FL ZIP 33014

0303509543

4 Express Package Service
- FedEx First Overnight
- FedEx Priority Overnight
- FedEx Standard Overnight
- FedEx 2Day A.M.
- FedEx 2Day
- FedEx Express Saver

5 Packaging
- FedEx Envelope
- FedEx Pak
- FedEx Box
- FedEx Tube
- Other

6 Special Handling and Delivery Signature Options
- Saturday Delivery
- No Signature Required
- Direct Signature
- Indirect Signature

Does this shipment contain dangerous goods?
- No
- Yes Shipper's Declaration not required
- Yes As per attached Shipper's Declaration
- Dry Ice
- Cargo Aircraft Only

7 Payment Bill to:
- Sender
- Recipient
- Third Party
- Credit Card
- Cash/Check

Total Packages
Total Weight
Total Declared Value

1.1.1



7-8-19

June 27, 2019

Dear Customer:

The following is the proof-of-delivery for tracking number **814687469000**.

| Delivery Information: | | | |
|---|---|---|---|
| Status: | Delivered | Delivered to: | Residence |
| Signed for by: | Signature not required | Delivery location: | FL |
| Service type: | FedEx First Overnight | Delivery date: | Jun 26, 2019 07:57 |
| Special Handling: | Deliver Weekday | | |
| | Residential Delivery | | |

NO SIGNATURE REQUIRED
Proof-of-delivery details appear below; however, no signature is available for this FedEx Express shipment because a signature was not required.

| Shipping Information: | | | |
|---|---|---|---|
| Tracking number: | 814687469000 | Ship date: | Jun 25, 2019 |

| Recipient: | Shipper: |
|---|---|
| FL US | ALLENTOWN, PA US |

Thank you for choosing FedEx.